**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------

|  |  |  |
|---|---|---|
| | x | |
| KHAREY WISE, DOLORIS WISE, DANIEL WISE | x | |
| MICHAEL WISE, VICTOR WISE AND | | |
| NORMAN WISE | | |
| Plaintiffs, | x | **03 Civ. 9974** |
| | | |
| -against- | x | **COMPLAINT** |
| | | |
| THE CITY OF NEW YORK; NEW YORK CITY | x | **and JURY DEMAND** |
| | | |
| POLICE DEPARTMENT; NEW YORK COUNTY | | |
| DISTRICT ATTORNEY=S OFFICE; NEW YORK | x | |
| COUNTY DISTRICT ATTORNEY ROBERT | | |
| MORGENTHAU; CITY POLICE COMMISSIONER | x | |
| RAYMOND KELLY; FORMER NEW YORK CITY | | |
| POLICE COMMISSIONER BENJAMIN WARD; | x | |
| FORMER NEW YORK CITY POLICE DEPARTMENT | | |
| CHIEF OF DETECTIVES COLANGELO; FORMER | x | |
| NEW YORK CITY POLICE DEPARTMENT | | |
| MANHATTAN CHIEF OF DETECTIVES | x | |
| ROSENTHAL; FORMER NEW YORK CITY POLICE | | |
| DEPARTMENT CHIEF OF PATROL BOROUGH | x | |
| MANHATTAN NORTH SELVAGGI; NEW YORK | | |
| CITY POLICE DETECTIVES RAMON ROSARIO, | x | |
| CARLOS GONZALEZ, HARRY HILDEBRANDT, | | |
| MICHAEL SHEEHAN, JOHN HARTIGAN, THOMAS | x | |
| MCKENNA, HUMBERTO ARROYO, SCOTT JAFFER, | | |
| JOHN O=SULLIVAN, JOHN TAGLIONI, BILL KELLY, | x | |
| ROBERT NUGENT, BRUNO FRANCISCI, THOMAS | | |
| McCABE; NEW YORK CITY POLICE SUPERVISORY | x | |
| DETECTIVES DEPUTY INSPECTOR POWELL, | | |
| SERGEANT ROBERT FISTON, LIEUTENANT JACK | x | |
| DOYLE; NEW YORK CITY POLICE DETECTIVES | | |
| JOHN DOES AND MARY ROES; NEW YORK | x | |
| YORK COUNTY ASSISTANT DISTRICT ATTORNEYS | | |
| LINDA FAIRSTEIN ELIZABETH LEDERER AND | x | |
| TIM CLEMENTS | | |
| | | |
| Defendants. | x | |

------------------------------------------------------------------

## PRELIMINARY STATEMENT

This is a civil rights action in which the plaintiffs, seek relief for the defendants' violation of their rights secured by the Civil Rights Acts of 1866 and 1871, 42 U.S.C. Sections 1983 and 1985, of their rights secured by the Fourth, Fifth, Sixth, Thirteenth and Fourteenth Amendments to the United States Constitution, and of their rights secured under the laws and Constitution of the State of New York.  The plaintiffs seek compensatory and punitive, damages, and declaratory and injunctive relief.

## JURISDICTION

1.   Jurisdiction is conferred upon this Court by 28 U.S.C. ''1331, 1343 (3) and (4), this being an action seeking redress for the violation of the plaintiff's constitutional and civil rights.

2.   Plaintiffs= claim for declaratory and injunctive relief is authorized by 28 U.S.C. ''2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

3.   The plaintiff further invokes this Court's pendent jurisdiction, pursuant to 28 U.S.C. '1367(a), over any and all state law claims and as against all parties that are so related

2

to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.

4.    The plaintiff demands a trial by jury on each and every one of their claims as pled herein.

## VENUE

5.    Venue is proper for the United States District Court for the Southern District of New York where the incidents complained of occurred and where defendants have their principle place of business.

## PARTIES

6.    Plaintiff, KHAREY WISE, is an African-American citizen and resident of the United States, and was at all times relevant herein a resident of the City, County and State of New York.

7.    Plaintiff, DOLORIS WISE, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York.

8.    Plaintiff, DANIEL WISE, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York. He is the brother of KHAREY WISE. He is a minor, and sues by his parent and next friend, DOLORIS WISE.

3

9.    Plaintiff, MICHAEL WISE, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York. He is the brother of KHAREY WISE.

10.    Plaintiff, VICTOR WISE, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York. He is the brother of KHAREY WISE.

11.    Plaintiff, NORMAN WISE,  is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York. He is the brother of KHAREY WISE.

12. Defendant CITY OF NEW YORK is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible.   The defendant CITY OF NEW YORK assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by the NEW YORK CITY POLICE DEPARTMENT.

4

13.   Defendant NEW YORK COUNTY DISTRICT ATTORNEY=S OFFICE is a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within the County and City of New York and assumes the risks incidental to the employment, training and supervision of its assistant district attorneys.

14.   Defendant NEW YORK COUNTY DISTRICT ATTORNEY ROBERT MORGENTHAU is and was at all times relevant herein the District Attorney of the County of New York, and is responsible for, and the chief architect of, the policies, practices and customs of the NEW YORK COUNTY DISTRICT ATTORNEY=S OFFICE as well as responsible for the hiring, screening, training, retention, supervision, discipline, counselling and control of the assistant district attorneys who work in his office.  He is sued individually and in his official capacity.

15.  Defendant NEW YORK CITY POLICE COMMISSIONER RAYMOND KELLY is the Police Commissioner for the CITY OF NEW YORK, and is responsible for, and the chief architect of, the policies, practices and customs of the NEW YORK CITY POLICE DEPARTMENT as well as responsible for the hiring, screening, training, retention, supervision, discipline, counselling and control of

5

the police officers and detectives under his command.  He is sued individually and in his official capacity.

16.  Defendant FORMER NEW YORK CITY POLICE COMMISSIONER BENJAMIN WARD was, at the time of the arrest and investigations alleged herein, the Police Commissioner for the CITY OF NEW YORK, and was and is responsible for, and the chief architect of, the policies, practices and customs of the NEW YORK CITY POLICE DEPARTMENT as well as responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers and detectives under his command. He is sued individually and in his official capacity.

17.  Defendant NEW YORK CITY POLICE CHIEF OF DETECTIVES (FNU) COLANGELO was, at all times relevant herein, the Chief of the Detective Division of the New York City Police Department and was and is responsible for, and the chief architect of, the policies, practices and customs of the Detective Division as well as responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers and detectives under his command.  He is sued individually and in his official capacity.

18.  Defendant NEW YORK CITY POLICE CHIEF OF MANHATTAN DETECTIVES (FNU) ROSENTHAL, was, at all times relevant herein,

the Chief of the Detective Division of the New York City Police
Department and was and is responsible for, and the chief
architect of, the policies, practices and customs of the
Detective Division as well as responsible for the hiring,
screening, training, retention, supervision, discipline,
counseling and control of the police officers and detectives
under his command.  He is sued individually and in his official
capacity.

     19.    Defendant NEW YORK CITY POLICE DEPARTMENT
CHIEF OF PATROL BOROUGH MANHATTAN NORTH (FNU) SELVAGGI was at all
times relevant herein an officer, employee, and agent of the NEW
YORK CITY POLICE DEPARTMENT, a municipal agency of the CITY OF
NEW YORK.  He is sued individually and in his official capacitiy.

     20.    Defendants NEW YORK CITY POLICE DETECTIVES RAMON
ROSARIO, CARLOS GONZALEZ, HARRY HILDEBRANDT, MICHAEL SHEEHAN,
JOHN HARTIGAN, THOMAS MCKENNA, HUMBERTO ARROYO, SCOTT JAFFER,
JOHN O=SULLIVAN, JOHN TAGLIONI, BILL KELLY, ROBERT NUGENT, BRUNO
FRANCISCI and THOMAS McCABE, were, at all times relevant herein,
officers, employees, and agents of the CITY OF NEW YORK.   They
are sued individually and in their official capacities.

     21.    Defendants NEW YORK CITY POLICE DETECTIVES DEPUTY

INSPECTOR POWELL, SERGEANT ROBERT FISTON, LIEUTENANT JACK DOYLE and NEW YORK CITY POLICE DETECTIVES JOHN DOES AND MARY ROES were, at all times relevant herein, officers, employees, and agents of the CITY OF NEW YORK.    They are sued individually and in their official capacities.

22.    Defendants NEW YORK COUNTY ASSISTANT DISTRICT ATTORNEYS LINDA FAIRSTEIN, ELIZABETH LEDERER and TIM CLEMENTS were, at all times relevant herein, officers, employees and agents of the New York County District Attorneys Office.    They are sued individually and in their official capacities.

23.    At all times relevant herein, the individual defendants herein were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of either the New York City Police Department and the NEW YORK COUNTY DISTRICT ATTORNEY=S OFFICE and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties.    They were acting for and on behalf of the New York City Police Department and the NEW YORK COUNTY DISTRICT ATTORNEY=S OFFICE at all times relevant herein with the power and authority vested in them as officers, agents and employees of the New York City Police Department and the NEW YORK COUNTY DISTRICT

8

ATTORNEY=S OFFICE and incidental to the lawful pursuit of their duties as officers, employees and agents of the New York City Police Department and the NEW YORK COUNTY DISTRICT ATTORNEY=S OFFICE.

<u>**STATEMENT OF FACTS**</u>

24.  On April 19, 1989, KHAREY WISE was 16 years old and lived at home at 1309 Fifth Avenue, New York, New York, 10029. As of that date WISE had never been arrested or taken into custody by any law enforcement agency.

25.  On April 19, 1989, sometime between 9:00 and 9:30 p.m., a series of incidents allegedly occurred in Central Park in New York City in the following order:  A man was allegedly accosted by a group of youths on the East Drive of the park.  A few minutes later another person was allegedly assaulted and robbed. Thereafter a couple on a tandem bicycle was allegedly menaced. Moments later, a taxi cab driver allegedly had rocks hurled at his cab and was allegedly threatened when he got out of the car to investigate.  Thereafter, a series of four male joggers were allegedly set upon on the jogging path at the northern end of the Central Park reservoir.  Two of the male joggers escaped unharmed but two were allegedly assaulted.

26.  At approximately 1:30 a.m., on April 20, 1989, an unconscious woman, who has since been publicly identified as Patricia Meili, was found by two men walking on a footpath through Central Park.  The victim, a twenty-nine-year-old white woman, who came to be known as the ACentral Park Jogger,@ was removed to a hospital.  She had been brutally beaten about the head and eyes, and suffered numerous bruises, scratches and abrasions elsewhere on her body.  She had lost significant amounts of blood.  Her t-shirt had been rolled into a ligature and used to tie her in a distinctive fashion.  Subsequent investigation revealed that she had been raped and sodomized.

27.  Raymond Santana and Kevin Richardson, as well as a number of other youths, were apprehended sometime during the evening on April 19, 1989, after police officers, responding to reports concerning some of the alleged incidents described above, spotted them on the western outskirts of the park in the vicinity of 100th Street and Central Park West.   In the course of their apprehension, plaintiffs Santana and Richardson were subjected to unnecessary and excessive force.

28.  Kharey Wise, along with two others who were subsequently arrested, prosecuted and convicted, Yusef Salaam and Anton McCray, was brought in for questioning on April 20, 1989,

10

after they had allegedly been identified by other youths as having been present at or participated in some of the events in the park on the evening of April 19, 1989.

29. Over the course of the next 24 to 48 hours, Wise, McCray, Santana and Richardson were questioned by numerous teams of detectives, police officers and representatives of the District Attorney≡s office, including, but not limited to, defendants Ramon Rosario, Carlos Gonzalez, Harry Hildebrandt, Michael Sheehan, John Hartigan, Thomas McKenna, Humberto Arroyo, Scott Jaffer, John O≡Sullivan, John Taglioni, Bill Kelly, Robert Nugent, Thomas McCabe, Assistant District Attorney Elizabeth Lederer and Tim Clements. Present and consulting with the above listed defendants during the questioning and investigation was Assistant District Attorney Linda Fairstein. The questioning was done, in part, without family advisors being present and, with the exception of a rehearsed videotape statement, which came at the end of the interrogation process, no audio or video recordings were made of the questioning. These interrogations were undertaken by the individual defendants pursuant to the policies, practices and customs of the defendants City of New York, the New York City Police Department and the New York County District Attorney≡s Office and were undertaken in a manner and

11

method designed to exploit the youth of the plaintiffs and their lack of familiarity with the criminal justice system.

30.  As a result of this prolonged questioning, the defendants obtained inculpatory statements from Kharey Wise and all of the youths, although the statements were inconsistent with and conflicted with each other.  These statements were obtained as a result of a variety of methods employed by the defendants which exploited their youthful age of the and the lack of experience they and their parents and family members had with the criminal justice system.  These methods included, *inter alia*, coercion, isolation, intimidation, manipulation, suggestiveness, deceit, false promises, sleep deprivation, actively shaping the statements= contents before they were formally given, telling Kharey Wise what facts to put in his written statements, withholding certain information from the him and his family, and misleading him and his family members about the true intent behind the defendants questioning.  Because of his youth he was especially vulnerable to the methods utilized by the defendants. The defendants also manipulated the relationships between the youths and their parents or family members, converting them into authority figures against the youths and in effect turning the family members into interrogators.   The defendants used these

12

techniques to elicit certain statements from the youths, which implicated themselves in a number of crimes, which had occurred in the park on April 19, 1989.    Although none of the youths admitted attacking or raping Meili, each ultimately rendered an account of events in which he unwittingly made himself a possible accomplice to the crimes committed against her.

31.    In particular, Kharey Wise was interrogated by one or more police officers and detectives for a number of hours, without his mother present, while his mother was misled by other police officers about which precinct he was being held at.

32.    The statements elicited from Kharey Wise, and the others charged with him, had serious weaknesses and major inconsistencies.    The accounts allegedly given by Kharey Wise, and the others charged with him, differ on significant details, such as who initiated the attack, who knocked the victim down, who held her, who undressed her, who struck her, who raped her, what weapons were used during the attack, the location of the attack, the time of the attack, and when, in the sequence of events, the attack took place.    For example, on the issue of who knocked the jogger to the ground, Richardson said McCray, Santana and Steve Lopez did it.    McCray said everyone charged her.    Santana said Richardson did it.    On

13

the issue of who raped Meili, Richardson allegedly named McCray, Santana and Steve Lopez.  McCray alleged identified a tall, skinny black male, a Puerto Rican with a black hoodie, Clarence Thomas and Richardson as the persons who raped Meili and further allegedly stated that he himself simulated having sex with her. Santana alleged identified Richardson as the person who raped Meile.

33. KHAREY WISE was videotaped by ADA ELIZABETH LEDERER, and then further questioned by Defendant Det. HARTIGAN, without his mother being present, and in a manner intended to coerce him onto making a statement that would be more inculpating.

34.     In his attempt to comply with this coercion to confess, KHAREY WISE then made a further videotaped confession, at the behest of Defendants HARTIGAN and LEDERER, which included fabricated details, including the statement that one of the other arrestees had cut the clothing off Patricia Melili, and that she had been cut on her legs by a knife, which these Defendants knew were not accurate.

35. In response to Defendant LEDERER's questioning, KHAREY WISE stated that he had been induced to make his statement by being yelled at and struck by police officers.

14

36.  KHAREY WISE was also falsely led to believe by these Defendants that if he made an inculpatory statement that he would be allowed to go home, and so stated in his statement.

37.  Despite these indicators that KHAREY WISE was making an inculpatory statement not based on actual guilt, but because he was coerced into making such a statement, these Defendants deliberately failed to inquire into those aspects of the statement detailed above which pointed to it being coerced, and instead, conspired with other Defendants to make use of the confession which they knew to be false and to cover up the coerced nature of the confession.

38.  Richardson allegedly said that the jogger's bra was ripped off, when in fact it was still on her when she was found. Santana allegedly described the jogger as naked was they left, although she was found with her jogging bra still on and her t-shirt tied around her head. Moreover, neither Kharey Wise or the others arrested and charged with them accurately described where the attack on the jogger took place.

39.  The statements also conflicted with the physical evidence. For instance, Meili lost significant amounts of blood, yet, there was no blood evidence that implicated Kharey Wise or any of the youths in the crime against her. In addition, the

15

impression left on the ground from the spot where Meili was first knocked down to where she was dragged was measured at the time by crime scene detectives to be 40 feet long and no more than 16 to 18 inches wide, a fact which excluded the possibility that she was dragged by five un-regimented teenage boys.

40.  The unreliability of the methods utilized by the defendants to elicit the false statements from Kharey Wise and the other youths concerning their involvement in the attack on Meili is most clearly demonstrated by that fact that the DNA evidence and the later confession by another individual, Matias Reyes, demonstrates that they were false.

41.  In fact, the defendants knew at the time they were interrogating Kharey Wise and the other youths, or reasonably should have known, of a far more likely suspect, Matias Reyes. On April 17, 1989, or shortly thereafter, some of these same defendants, including but not limited to defendants Michael Sheehan and Bruno Francisci, took or knew about a statement by another one of Reyes=s victims who described a similar attack by a single attacker in the park very near the location of the Meili attack only two days earlier.  Moreover, these same defendants knew at or around the time they were eliciting the false statements from Kharey Wise and the other youths, that Reyes had

been treated at an area hospital for an injury, which was described by the victim of his April 17th attack.

42.  The failure to connect Reyes to the attack on the Central Park Jogger at the time of the arrests and interrogation of Kharey Wise and the other youths, as well as subsequently, was not simply the result of sloppy investigative work; it demonstrates a deliberate intent on the part of the defendants to cover-up Reyes= connection to the Central Park Jogger case because it would have completely undermined the integrity of the prosecution of the youths; a prosecution which both the district attorney and police officer defendants were heavily invested in both because of the extreme amount of public attention to the prosecution and for the benefit of their careers.

43.  On December 11, 1990 a jury convicted plaintiff KHAREY WISE, of Assault in the First Degree; Sexual Abuse in the First Degree; and Riot in the First Degree. The false statements elicited from the plaintiff and other suspects were admitted into evidence in the trial and were critical to the conviction of Wise.

44.  WISE's convictions were affirmed by the Appellate Division, 204 AD. 2d 133. The court of Appeals denied leave to

17

appeal. He served over thirteen years in prison and was required to register as a sex offender following his release from prison.

45.   Throughout his confinement in jail and subsequent to his release, Kharey Wise has consistently denied any involvement in the attack on Meili.

46.   In January, 2002, Matias Reyes informed law enforcement officials that he, alone, committed the rape and other crimes concerning the female jogger.  Subsequent DNA testing, and a thorough review of the evidence by the District Attorney=s office, confirmed that he alone perpetrated these crimes against Meili.  Reyes is serving sentences totalling thirty-three and one-third years to life imprisonment for three rape/robberies, one rape/murder, and one robbery that he committed between June 11 and August 5, 1989.  In addition, he committed a rape and sexual assault on April 17, 1989, just two days before the attack on Meili, which was investigated by defendants herein.   The April 17th assault presented fingerprint-like characteristics similar to that, which were also present in the rape and assault of Patricia Meili on the 19th.

47.   On May 8, 2002, the District Attorney=s office was notified that Reyes= DNA matched the DNA taken from the sock that had been found at the Central Park crime scene.

18

48.  On September 24, 2002, plaintiff Wise, filed a motion
to vacate the judgment of conviction, pursuant to Criminal
Procedure Law (CPL) 440.10(1)(g), which had previously been
handed down and affirmed by the New York appellate courts on the
grounds of newly discovered evidence.

49.    Following an investigation of Wise's claim, the
District Attorney=s Office conceded the veracity of the newly
discovered evidence contained in the plaintiffs= 440 motion,
which consisted of accounts of events provided by Reyes, who
stated that he alone attacked and raped Meili, and DNA test
results which conclusively established that Reyes was the sole
source of semen found on the sock at the crime scene and a
cervical swab taken from the victim, as well as a pubic hair
found on the same sock.

50.  The evidence provided by Reyes included a record of
prior, similar attacks committed by him, including an assault and
rape committed in Central Park two days before the attack on
Meili, his description of the victims radio headset and keys,
which was never mentioned in the earlier investigation, and
scientific test results undermining the probative value of other
evidence introduced at the criminal trials.

51.  Following Reyes= admissions, the District Attorney=s Office conducted further forensic testing of DNA and hair sample to see whether the results corroborated Reyes= version of his involvement in the crime.  These tests corroborated Reyes= account, including, inter alia, that the DNA on the sock found at the Central Park crime scene and the DNA on the cervical swab taken from the victim matched Reyes= DNA.  Moreover, testing of previously untested semen found on the sock established that Reyes was the source of the DNA on the sock to a factor of one in 6,000,000,000 people.

52.  At the time of the original proceeding, DNA evidence was extracted from semen deposited on the jogger=s sock, found near her at the crime scene.  It did not match any of the arrested youths, or any other known sample at the time.  The same was true of DNA evidence extracted from a cervical swab; it did not match the defendants or any other known sample at the time.

53.  The testimony at the original trial established, however, that the DNA from both the victim and the sock appeared to have come from the same source.  It also established that the DNA was not a mixture, it was from a single source, meaning that only one individual had ejaculated.

20

54.  No physical or forensic evidence recovered at the scene or from the person or effects of the victim connected any of the youths to the attack on the jogger.

55.  Reyes= statement that he, and he alone, was responsible for the assault on the jogger, is corroborated by, consistent with, or explanatory of objective evidence in a number of important respects, including, *inter alia*, that his DNA, and his alone, was found on the victim; that the narrow physical trail left by Reyes when he dragged Meili from the location of the initial attack to the nearby woods clearly established that Meili was attacked by a single assailant; that the manner in which Meili was bound was consistent with other attacks perpetrated by Reyes; that the manner in which Meili was struck around the eyes was consistent with other attacks perpetrated by Reyes; that Meili had injuries on her face which were consistent with the ring that Reyes was wearing; that he had described Meili=s radio headset and keys, which were never mentioned in the earlier investigation; and, that all of Reyes= other victims, including the one on April 17th, were assaulted by a lone assailant, Reyes.

56.  Corroboration of Reyes= account of his participation in the crime is found both in the pattern of his other sexual attacks and in some of their specific facts.  He consistently

21

targeted and stalked Caucasian women, or women who appeared to be Caucasian.  All of his rapes or attempted rapes also involved robbery.  He would characteristically tie and bind his victims in an unusual manner, which, combined with other aspects of the crime, clearly identified him as the perpetrator of the attack on Meili.  He would characteristically severely beat his victims around the face and eyes in an attempt to blind them so that they would be unable to identify him.

57.  Prior to April 19, 1989, there is no evidence that Reyes knew Kharey Wise or associated with the other arrested youths or any of the individuals known to have been in Central Park on the night of April 19, 1989.

58.  In or about August, 1989, Reyes was apprehended and questioned by, *inter alia*, defendants Sheehan and Francisci and questioned about numerous sexual assaults that he was suspected of perpetrating.  Reyes= DNA was analyzed and he was matched to several sexual assaults that occurred during the spring and summer of 1989 in or about the same general vicinity as the attack on Meili.  Reyes eventually pled guilty to several rapes and sexual assaults.  His plea of guilty occurred prior to the commencement of the trial of the Kharey Wise.

22

59.  On December 19, 2002, the Supreme Court, New York
County, by Justice Charles J. Tejada, found that the new evidence
offered in Kharey Wise motion was newly discovered within the
meaning of the applicable statutes and case law and that it could
not have reasonably been discovered by the defendants before the
original criminal trial by the exercise of due diligence.  The
Court therefore granted Kharey Wise's motion to vacate the
judgment of convictions as to all the convictions against him and
the other youths.

60.  The defendant police officers, detectives and district
attorneys knew, or should have known at the time, and, on
information and belief, concealed from Kharey Wise and the other
youths and their defense counsel, and from the public as well,
that at the time they had elicited false statement other youths
which implicated him in the rape and sexual assault on Meili in
Central Park in April, 1989, a serial rapist who habitually
stalked white women in their 20's, who attacked them, beat them,
and raped them, who always robbed his victims, and frequently
stole Walkmans, who tied his victims in a fashion much like the
Central Park jogger, and who beat and raped a woman in Central
Park two days before the attack on the transverse a few hundred
yards from where Meili was found, and whose DNA was the only DNA

recovered inside and alongside the victim, who had no connection with any of the youths charged and who committed all of his sex crimes alone, was also at large. All of these facts were known to the defendants at the time they were investigating the Jogger case. Yet, the defendants deliberately ignored these facts, in favor of a speedy and politically expedient accusation that it was Kharey Wise and the other youths who had committed the attack on Meili.

61. The defendants, in concealing and not disclosing this evidence, not only put the public at great risk, they deprived Kharey Wise and the other youths the opportunity to argue at his criminal trials a theory of the case different than that which was put forward at trial by the District Attorney=s Office and the police officers and detectives who testified, and they led directly to the convictions of all the youths charged with him.

62. The alleged accounts by Kharey Wise, and those arrested and prosecuted with him, were inaccurate and inconsistent and differed on significant details of the crime. In contrast, the account by Reyes was accurate about specific details of the crimes against the jogger. Reyes accurately described the crime

24

scene in detail, as well as what the victim was wearing.  He also indicated that he used a heavy branch to attack her, which was consistent and explanatory of the forensic medical and crime scene evidence.  Most persuasively, his account was corroborated by the fact that his modus operandi in the Jogger case matched the ones he had used in similar sexual attacks involving the targeting and stalking of other women during the same period of time.

63.  Moreover, although there was no DNA forensic evidence offered against  Kharey Wise and the other youths at trial, Reyes= DNA matched the DNA found on one of Meili=s socks found at the Central Park crime scene and the DNA on the cervical swab taken from the victim.  In addition, mitochondrial DNA testing established that Reyes was also the source of the pubic hair found on the sock in Central Park and confirmed that no one else=s DNA was present in the samples taken from the victim or at the crime scene.

64.  It is virtually self evident that the confession of a self admitted murderer and serial rapist, corroborated by physical evidence including scientific testing demonstrating that Reyes was the sole source of DNA evidence connected to the Central Park jogger=s rape to a factor of one to 6,000,000,000,

25

would have resulted in an acquittal of Kharey Wise and the other
youths at their criminal trials.  Indeed, an honest appraisal of
this evidence would have resulted in a dismissal of the
indictment prior to any trial.

65.  Upon information and belief, evidence which connected
Reyes to the rape and assault of Meili on April 19, 1989, was
known to the defendants who were responsible for investigating
and prosecuting Kharey Wise and the other youths and was
deliberately and purposefully withheld from the youths and their
defense counsel, resulting in their malicious prosecution and
subsequent convictions.   Moreover, following the arrests of
Kharey Wise and the other youths, information obtained by the
defendants which was exculpatory, inconsistent with or
contradicted the defendants= theory of the case that Meili was
attacked and assaulted by a gang of black and Hispanic youth, was
not, pursuant to the policies and practices of the NYPD and the
District Attorney=s Office, recorded in official NYPD forms or,
if recorded, was kept from the plaintiffs= attorneys during the
prosecution of the criminal cases.

66.  At no time from April 19, 1989 until April 18, 1990,
when the first convictions were handed down by a jury, did the
defendants, despite their knowledge of Reyes and his method of

26

operating, particularly after his arrest in August, 1989, ever
reveal the existence of Reyes to the plaintiffs or their counsel
or to the Court.  Nor did the defendants reveal the existence of
Reyes to the arrested youths and their counsel after April 18,
1990, up to the present.

67.    Despite the evidence demonstrating Reyes= guilt for the crimes against Meili,
which corroborated and established the innocence of Kharey Wise and the other arrested and
convicted youths, the defendants herein have continued to suppress the truth about what
happened in Central Park on April 19, 1989, by, inter alia, establishing a special commission that
ratified the wrongful conduct of these defendants.

68.    If not in April, 1989, certainly by August, 1989, the defendants knew or should
have known that their theory that Kharey Wise and the other youths had committed the crimes
against Meili had no evidentiary support, particularly after DNA tests conclusively demonstrated
that Kharey Wise and the other youths were not responsible for the attack on her.  Moreover, the
evidence as of August, 1989, particularly after the arrest of Reyes for his other crimes, would
have led even the most neophyte investigator to conclude that it was more likely that a single
assailant had raped and battered Meili, and not, as the defendants slavishly maintained, that the
youths were responsible for that crime.

69.    Certainly no later than August, 1989, and probably well before, the defendants
knew or should have known that the crimes committed against Meili and Reyes= other crimes
demonstrated many of the same characteristics, such as the manner in which the victim was tied
and the manner in which the victim was battered in the eyes and face.  Rather than question the

27

integrity of their prosecution, the defendants, including those working in both the NYPD and the

District Attorney=s Office, suppressed the truth about Reyes, including, on information and

belief, encouraging the victim of Reyes= crime on April 17, 1989, two days before Meili was

attacked and raped, to drop the prosecution.

70.    In addition to their efforts to suppress the truth at the time of the prosecution, the

defendants have continued to actively conspire to propound the belief that Kharey Wise and the

other youths were and are  in fact guilty of the crimes he was charged with, notwithstanding his

exoneration by the court, the DNA evidence linking Reyes to the crimes against Meili and Reyes

confession that he alone perpetrated this crime, and that the defendants engaged in no

misconduct in the course of their investigation and prosecution of the plaintiffs.  Overt acts in

furtherance of this conspiracy include, *inter alia*, public statements which continue to state that

Kharey Wise and the other youths committed all the crimes he was charged with and the

empanelling of a commission which was charged with reviewing the conduct of the police in this

case and which fully exonerated the police and the NYPD from any wrongdoing, thereby

ratifying the bad faith, dishonest and concealment of the truth about who raped and assaulted

Patricia Meili on April 19, 1989.

71.    On November 1, 2002, defendant Police Commissioner Raymond Kelly

announced the establishment of an investigatory panel (hereinafter referred to as the AArmstrong

Commission@) consisting of Michael Armstrong, a former prosecutor now in private practice,

Stephen L. Hammerman, the current Deputy Commissioner of the NYPD for Legal Matters, and

Jules Martin, a former high ranking chief in the NYPD, to review the events of April 19, 1989

and thereafter to determine, *inter alia*, whether police supervisors or officers acted properly or improperly.

72.    Implicit in the appointment by Defendant Kelly of a Commission in which NYPD career police officials predominated to independently conduct an investigation after the District Attorney's Office had joined in a motion to set aside the convictions was a mandate by Kelly to whitewash the actions of the police.

73.    Based on their investigation, this panel of so-called experts issued a report that concluded that there was no misconduct on the part of the New York City Police Department in the arrests and interrogations of Kharey Wise and the other youths, either in the manner in which they interrogated them or in their failure to connect Reyes to the rape and sexual assault of Meili prior to him coming forward and admitting his involvement.

74.    In addition, although they were not officially charged with the task, the Armstrong Commission went further and concluded that, notwithstanding the Reyes confession and the evidence that corroborated his quilt as the sole assailant of Meili, Kharey Wise and the other youths was nevertheless guilty of the sexual assault on Meili on April 19, 1989.

75.    Defendant Police Commissioner Kelly accepted the findings of this panel and by so doing he has ratified the wrongful conduct perpetrated by the defendant police officers, detectives and their supervisors.

76.    The defendants= illegal arrest, confinement and imprisonment, malicious prosecution, and wrongful conviction of Kharey Wise, without probable cause, with the attendant suppression of  exonerating exculpatory evidence, the coercion and manufacture and intentional misrepresentation of knowingly false inculpatory evidence, and the deception of

grand juries, judges, petit juries, and the New York courts concerning this evidence, constituted

an unconstitutional seizure of the plaintiff, and was effected without due process of law, in

violation of the Fourth, Fifth, Sixth, Thirteenth and Fourteenth Amendments to the U.S.

Constitution, and proximately and directly caused the plaintiff grievous permanent injury,

including more than 13 years of imprisonment in prison, and the attendant loss of freedom,

companionship, and income; mental and physical pain, suffering, anguish, fear, and humiliation

and defamation of character and reputation which was caused by his public branding as a sex

offender.

77.  The conduct of the defendants in maliciously
prosecuting and conspiring to cover up the truth about what
happened in Central Park on April 17, 1989, and in subsequently
ratifying this wrongful conduct in 2003, proximately caused the
plaintiff serious and permanent physical and emotional injury,
pain and suffering, mental anguish, humiliation and
embarrassment.

**FIRST CLAIM**
**(Violation of Rights Secured by 42 U.S.C. '1981 and the**
**Thirteenth Amendment to the United States Constitution)**

78.  The plaintiff incorporate by reference the allegations
set forth in Paragraphs 1 through 77 as if fully set forth
herein.

30

79.  The conduct and actions of defendants, acting under color of state law, in subjecting the plaintiff, who is African-American, to malicious prosecution and wrongful conviction and a conspiracy to cover-up the truth, was motivated by racial animus, was done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of their acts, was done without lawful justification, and was designed to and did cause specific and serious bodily, mental and emotional harm, pain and suffering in violation of the plaintiff's Constitutional rights as guaranteed under 42 U.S.C. '1983 and the Fourth, Fifth, Sixth, Thirteenth and Fourteenth Amendments to the United States Constitution.

### SECOND CLAIM
**(Violation of Rights Secured by 42 U.S.C. '1983 and the Fourteenth Amendment to the United States Constitution for Assaulting and Detaining the Plaintiff)**

80.  The plaintiff incorporate by reference the allegations set forth in Paragraphs 1 through 77 as if fully set forth herein.

81.  Defendants Colengelo, Rosenthal, Selvaggi, Rosario, Gonzalez, Hildebrandt, Sheehan, Hartigan, McKenna, Arroyo, Jaffer, O=Sullivan, Taglioni, Kelly, Nugent, Francisci, McCabe, Powell, Fiston, Doyle, Does and Roes and Fairstein and Lederer, with other investigative, supervisory, and command personnel, together and under color of law,

reached an understanding, engaged in a course of conduct, and otherwise conspired among and between themselves to deprive the plaintiff of his Constitutional rights, and did deprive plaintiff of said rights, including his right to be free from unreasonable arrest and seizure, from denial of counsel, from wrongful confinement, imprisonment, and conviction, and from malicious prosecution; and his right to access to the Courts, as protected by the First, Fourth, Fifth, Sixth, Thirteenth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. Sec. 1983. Because said actions were done with the knowledge and purpose of depriving plaintiff, who is African-American, of the equal protection of the laws and/or of equal privileges and immunities under the law, and with racial animus toward the plaintiff, they also deprived plaintiff of his right to equal protection of the laws under the Thirteenth and Fourteenth Amendments, and 42 U.S.C. Secs. 1983, 1985 and 1986.

82.    In furtherance of this conspiracy or conspiracies, the defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the facts set forth above, including, but not limited to, the wrongful arrest, imprisonment and prosecution of plaintiff and his co-defendants; the manufacture by the methods articulated above of knowingly false inculpatory evidence against plaintiff and his co-defendants; the suppression of exonerating exculpatory evidence, including, but not limited to, the Matias Reyes evidence, the failure to investigate the Matias Reyes evidence, either at the time it was received or after it became known that there was no scientific or physical evidence that linked the plaintiff to these crimes, the physical abuse and psychological coercion of the plaintiff and his co-defendants in an attempt to compel them to make false inculpatory statements against themselves and their co-defendants; the making of known misstatements and the presentation of this knowingly false and

32

incomplete evidence to prosecutors, judges, juries, and appellate courts; and  the filing of false and incomplete statements and reports.

83.    Each of the above named Defendants knew of the existence of a racially motivated conspiracy to deprive plaintiff of his civil rights, and failed to act to prevent this conspiracy from being carried out when she/he had a duty to do so.

84.    Said conspirac(ies) and overt acts were continuing in nature, and caused plaintiffs= constitutional violations and injuries, pain, suffering, fear, mental anguish, incarceration, conviction, imprisonment, humiliation, defamation of character and reputation, and loss of freedom, companionship, and income, as set forth more fully above.


### THIRD CLAIM
### (Violation of Rights Secured by 42 U.S.C. '' 1983 and 1985
### and the Fourteenth Amendment to the United States Constitution)

85.  The plaintiff incorporate by reference the allegations set forth in Paragraphs 1 through 84 as if fully set forth herein.

86.  In carrying out the investigation arrests, and interrogations of Plaintiff, each of the individual police officers and detective defendants acted pursuant to de facto policies of the New York City police department, which policies permitted and encouraged the coercion of confessions from youth without their parents being present, and thus without affording

them an opportunity through their parents to have counsel
present, the use of force, the threat of force, and intimidation
and coercion to obtain inculpatory statements, not investigating
allegations of use or threat of force by suspects in detention
during interrogation, and not questioning discrepancies in
inculpatory statements even when there was evidence from these
inconsistencies that the statements was the product of coercion.

87.    Defendant Kelly, as Police Commissioner for the City of New York, is, by
operation of state law and as a matter of fact, the final decision maker for New York with regard
to the investigative, arrest, custodial, and administrative acts, omissions, and decisions which he
made or participated in, as alleged above.

88.    On January 27, 2003, the three person panel appointed
by Commissioner Kelly to investigate whether any misconduct
occurred by members of the New York City Police Department
concerning the events of April 19, 1989, the Armstrong
Commission, issued a report containing its finding.  Those
findings exonerated members of the New York City Police
Department of any wrongdoing, and, moreover, continued to assert
that the plaintiffs herein were guilty of the sexual on Meili.
Those findings were accepted by defendant Commissioner Kelly.  In
so doing,  defendant Kelly ratified and condoned the wrongdoing that took place.

34

89.     These acts by defendant Kelly, directly and proximately caused the constitutional violations and injury to the plaintiff, and is directly chargeable to the defendant City of New York because of Commissioner Kelly≈s status as final decision maker for the City with respect to matters involving the New York City Police Department.

90.     Additionally, and/or alternatively, on information and belief, the City of New York, through its Police Department and Police Commissioners, including defendant Benjamin Ward, had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia,*

(a)     a  policy, practice and custom of suppressing, destroying or otherwise secreting from

criminal defendants exculpatory or exonerating  evidence; and

(b)     a policy, practice and custom of failing to properly train or supervise officers in the  proper  techniques  of  investigating  serious  crimes,  particularly  where  juveniles were  involved,  or  to  properly  discipline  officers  who  violate  the  Constitution  or law,  or  otherwise  transgress  the  rights  of  criminal  suspects  during  their investigations;

91.     These  interrelated  policies,  practices  and  customs,  separately  and/or  together, were  implemented  with  deliberate  indifference,  and  were  a  direct  and  proximate  cause  of  the plaintiffs≈ Constitutional violations and injuries, as set forth above.

**FOURTH CLAIM**

**(42 U.S.C. §1983 *Monell* Claim Against the City of New York)**

92.   The plaintiff incorporate by reference the allegations set forth in Paragraphs 1 through 91 as if fully set forth herein.

93.    The New York County District Attorney's Office itself, also had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia,*

94.    (a)    a   policy, practice and custom of suppressing, destroying or otherwise secreting

from criminal defendants exculpatory or exonerating evidence; and

(b)    a policy, practice and custom of failing to properly train or supervise officers in the proper techniques of investigating serious crimes, particularly where juveniles were involved, or to properly discipline officers who violate the Constitution or law, or otherwise transgress the rights of criminal suspects during their investigations;

95.    These interrelated policies, practices and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause of the plaintiffs' Constitutional violations and injuries, as set forth above.


**FIFTH CLAIM**
**(42 U.S.C. §1983 *Monell* Claim Against the**
**New York County District Attorney's Office)**

36

96. The plaintiff incorporate by reference the allegations set forth in Paragraphs 1 through 95 as if fully set forth herein.

97. By the actions described above, each and all of the defendants, jointly and severally, have committed the following wrongful acts against the plaintiff, which are tortious under the laws of the State of New York:

     a.   malicious prosecution;

     b.   conspiracy to cover-up;

     c.   negligence in causing the injuries to the plaintiffs;

     d.   intentional infliction of emotional distress upon the plaintiffs, in that the defendants intended to and did cause the plaintiffs severe emotional distress, and the defendants' acts were outrageous in the extreme and

     e.   negligent hiring, screening, retention, supervision and training of defendant police officers by defendants City of New York and New York City Police Department;

     f.   negligent hiring, screening, retention, supervision and training of defendant assistant

37

district attorneys by defendants New York County District Attorney=s Office and by the City of New York;

g.     conspiracy by the defendants to commit all of the above acts;

h.     violation of rights otherwise guaranteed to the plaintiff under the laws and Constitution of the State of New York.

98.     The foregoing acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed him by the laws and Constitution of the State of New York.

99.     Defendants were, at all times relevant to this Count, employees and agents of either the City of New York or the New York County District Attorney=s Office.    Each of the defendants was acting within the scope of his or her employment, and their acts and omissions, as alleged above, are therefore directly chargeable to their respective employers under state law under the doctrine of *respondent superior.*

100.    Plaintiff filed timely notices of claim.

101.    More than thirty days have elapsed without the City of New York having adjusted the claim.

**SEVENTH CLAIM**

38

**(Loss of Familial Association Claim for Plaintiffs)**

**under 42 U.S.C. § 1983)**

102. The plaintiff incorporate by reference the allegations set forth in Paragraphs 1 through 101 as if fully set forth herein.

103. At all times mentioned, plaintiffs DELORIS WISE, DANIEL WISE, MICHAEL WISE, VICTOR WISE and NORMAN WISE  , and were the mother and brothers of KHAREY WISE. At the time of the incarceration of KHAREY WISE, they did and still continue to live and associate together as a family and as such were and are entitled to the companionship, guidance, support and parenting services of KHAREY WISE, and did and still do have attachments to them arising from the familial relationship.

104. By reason of the foregoing conduct of the defendants, jointly and severally, acting under color of state law and within the scope of their employment, plaintiffs DELORIS WISE, DANIEL WISE, MICHAEL WISE, VICTOR WISE and NORMAN WISE and support, daily intimacy and services of plaintiff KHAREY WISE, which are guaranteed under the Thirteenth and Fourteenth Amendment of the United States Constitution, including the plaintiffs' liberty interest in preserving the integrity and stability of the family

relationship from intervention by the state without due process
of law.

105. The foregoing acts and conduct of the defendants were
the direct and proximate cause of injury and damage to plaintiffs
DELORIS WISE, DANIEL WISE, MICHAEL WISE, NORMAN WISE  and VICTOR
WISE, and violated their rights as guaranteed by the Fifth and
Fourteenth Amendments to the United States Constitution as well
as their statutory and common law rights as guaranteed by the
laws and Constitution of the State of New York.

WHEREFORE, the plaintiffs demand the following relief
jointly and severally against all of the defendants:

     a.    Compensatory and punitive damages for plaintiffs
        to plaintiffs

         KHAREY WISE, DELORIS WISE, DANIEL WISE, MICHAEL
        WISE,

         VICTOR WISE and NORMAN WISE, IN THE AMOUNT OF
         $50,000,000.


     b. A declaration that the Constitutional rights of
        KHAREY WISE were violated by his interrogation,
        prosecution, sentencing and imprisonment.

     c. An injunction requiring the expungement of all

criminal records with respect to KHAREY WISE, and directing the defendants to refrain from making public statements alleging that he was guilty of a crime in relation to the events for which he was criminally charged.

d. The convening and empanelling of a jury to consider the merits of the claims herein;

e. A court order, pursuant to 42 U.S.C. § 1988, that the plaintiffs are entitled to the costs involved in maintaining this action and attorneys' fees;

f. Such order and further relief as this court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

LENNOX S. HINDS, Esq.

Stevens, Hinds & White, PC

Attorney for Plaintiffs
116 W. 111th Street
New York, NY 10026
212-864-4445

DATED:    December 15, 2003
          New York, New York

41

42