UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
ANTRON MCCRAY, et al.,

                    Plaintiffs,

          -against-                        03 Civ. 9685 (DAB)
                                              OPINION
CITY OF NEW YORK, et al.,

                    Defendants.
--------------------------------X
KHAREY WISE, et al.,

                    Plaintiffs,

          -against-                        03 Civ. 9974 (DAB)
                                              OPINION
CITY OF NEW YORK, et al.,

                    Defendants.
--------------------------------X
YUSEF SALAAM, et al.,

                    Plaintiffs,

          -against-                        03 Civ. 10080 (DAB)
                                              OPINION
CITY OF NEW YORK, et al.,

                    Defendants.
--------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Before the Court are two separate Motions to Dismiss the

Complaints against them filed by Plaintiffs Antron McCray, Kharey

Wise, Yusef Salaam, Raymond Santana, Kevin Richardson, et al.

The first is filed by the City of New York, the New York City

Police Department, named individual Defendants Police

Commissioner Raymond Kelly, Detectives Louis Rosenthal, Mario

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _12/11/07_

Selvaggi, Thomas McKenna, Jose Rosario, Carlos Gonzalez, Harry Hildebrandt, Michael Sheehan, John Hartigan, Humberto Arroyo, Scott Jaffer, John O'Sullivan, John Taglioni, Robert Nugent, Bruno Francisci, Thomas McCabe, and former Assistant District Attorney Linda Fairstein ("City Defendants").  The second is filed by Defendants New York County District Attorney Robert Morgenthau, Assistant District Attorneys Elizabeth Lederer and former Assistant District Attorney Arthur Clements and the "New York County District Attorney's Office" (collectively, "DA Defendants").[1]  Each of the named Defendants is being sued individually as well as in his or her official capacities. (McCray Compl. ¶¶ 17-28; Wise Compl. ¶¶ 11-22; Salaam Compl. ¶¶ 6-18.)

Plaintiffs commenced this action against Defendants, alleging that the City and DA Defendants (collectively "Defendants") acted unlawfully by arresting, prosecuting, and incarcerating them for the attack on Patricia Meili.  This action was brought under three separate Complaints.

Plaintiffs in this action also include family members of these men.  Plaintiff Linda McCray is Antron McCray's mother. (McCray Compl. ¶ 106.) Plaintiff Grace Cuffee is the mother of

---

[1] Former Assistant District Attorney Arthur Clements is not named as a Defendant by either Plaintiff Salaam or Plaintiff Wise.

2

Kevin Richardson; Plaintiffs Connie Richardson, Valerie Cuffee, Crystal Cuffee and Angela Cuffee are his siblings.  Id.  Raymond Santana, Senior is the father of Raymond Santana.  Id.  It is unclear from the face of the Complaint whether Joann Santana is Raymond Santana's mother or sister.  Id.  Plaintiff Doloris Wise is Kharey Wise's mother; Plaintiffs Daniel Wise, Michael Wise, Victor Wise and Norman Wise are his brothers.  (Wise Compl. ¶ 103.)  Plaintiff Sharonne Salaam is mother to Yusef Salaam and Plaintiffs Aisha Salaam and Shareef Salaam are his sister and brother.  (Salaam Compl. ¶ 106.)  These Plaintiffs are hereinafter collectively referred to as the "Familial Plaintiffs."

Plaintiffs bring claims under 42 U.S.C. § 1983 and the First, Fourth, Fifth, Sixth and Fourteenth Amendment to the United States Constitution, assault, false arrest, malicious prosecution and Monell causes of action.  Plaintiffs' also allege claims pursuant to 42 U.S.C. § 1981 and the Thirteenth Amendment to the United States Constitution.  Additionally, Plaintiffs bring claims under 42 U.S.C. § 1985.  Plaintiffs further allege various violations of New York State law.  Familial Plaintiffs in particular bring a claim for loss of familial association.

The Defendants now move to dismiss the Complaints for

3

lack of subject matter jurisdiction, pursuant to Rule 12(b)(1),
and failure to state a claim upon which relief may be granted,
pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure.  City Defendants argue:  (1) Plaintiffs federal claims
are time-barred; (2) Plaintiffs claims are collaterally estopped;
(2) the Court lacks subject-matter jurisdiction under the Rooker-
Feldman doctrine; (3)  probable cause existed for the arrest;
(4) the claim for malicious prosecution fails as a matter of law;
(5) claims against Linda Fairstein are barred by the Eleventh
Amendment and the absolute immunity doctrine; (6) City Defendants
are entitled to qualified immunity; (7) Plaintiffs' claims do not
properly meet pleading standards, especially Plaintiff's
conspiracy claims; (8) any "cover up" claims fail as a matter of
law; (9) Plaintiffs claims for familial association should be
dismissed; and (10) the Court should decline to exercise pendent
jurisdiction over any state claims.

The DA Defendants argue:  (1) Plaintiffs malicious
prosecution and false arrest claims are barred by the Eleventh
Amendment and the doctrine of absolute immunity; (2) the claim
for malicious prosecution also fails as a matter of law because
probable cause existed for the prosecution, the DA Defendants
fulfilled their disclosure obligations and there was no

"favorable termination" of the criminal proceedings against Plaintiffs; (3) the Court lacks subject-matter jurisdiction under the Rooker-Feldman doctrine;  (4) probable cause existed for the arrest; (5) Plaintiffs federal claims are time-barred; (6) Plaintiffs do not properly allege false arrest claims against DA Defendants; (7) Plaintiffs false arrest claims are collaterally estopped; (8) Plaintiffs conspiracy claims are barred by the Rooker-Feldman doctrine and the doctrine of collateral estoppel; (9) loss of familial association claims against the DA Defendants fail because Plaintiffs do not allege intent, because DA Defendants are shielded by immunity and because they are collaterally estopped; (10) Plaintiffs Monell claims are improperly pleaded; and (11) Plaintiffs state law claims against DA Defendants fail procedurally and on the merits.

For the following reasons, Defendants' motion to dismiss the Complaints of Plaintiffs is GRANTED in part and DENIED in part. Plaintiffs are given leave to replead those claims which are not dismissed with prejudice herein.

5

## I. BACKGROUND[2]

Approximately 18 years ago, in 1989, Plaintiffs Yusef Salaam, Antron McCray, Raymond Santana, Kevin Richardson, and Kharey Wise, (collectively, "Plaintiffs") were arrested, tried and convicted for a number of serious crimes.  The charges against them included the rape, assault and attempted murder of Patricia Meili, a woman brutally attacked on April 19, 1989 while jogging in Central Park.  The local and national press covered their prosecution, and the cases against them generated significant media attention.  The matter became known as the "Central Park Jogger" case.

In 1989, McCray, Richardson and Santana were each 14 years old.  (McCray Compl. ¶¶ 30-32.)  Salaam was 15 years old, and Wise was 16 years old.  (Salaam Compl. ¶ 24; Wise Compl. ¶ 24.) In 1989, each of the Plaintiffs was a student, each resided with his parents and siblings; except for Plaintiff Salaam, none had any prior criminal experience.[3]  (McCray Compl. ¶ 30-32; Wise

---

[2] Unless otherwise indicated, the facts herein are as set forth in the Plaintiffs' Complaints.  Where otherwise indicated, the Court has taken appropriate judicial notice of matters of public record.  On a Motion to Dismiss, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court presumes all allegations in the Complaint to be true.  In deciding a motion to dismiss, the court must also draw all reasonable inferences in favor of the plaintiff.  See Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).

[3] Plaintiff Salaam was once arrested or taken into custody for a "minor juvenile matter."  (Pls.' Mem. Law at 6.)

Compl. ¶ 24; Salaam Compl. ¶ 24.)  Plaintiffs Salaam, McCray,

Richardson, and Wise, and their families, are African-Americans;

Plaintiff Santana, and his family, are Hispanic-American.

(McCray Compl. ¶ 30-32; Wise Compl. ¶ 24; Salaam Compl. ¶ 24.)

On April 17, 1989, two days before the Meili rape, a

Caucasian woman was attacked and raped in Central Park.  (McCray

Compl. ¶ 43; Wise Compl. ¶ 41; Salaam Compl. ¶ 43.)  She was

attacked by a single assailant.  (Id.)  She gave a statement

about the crime which was taken or allegedly known about by some

of the Defendants, including Detectives Michael Sheehan and Bruno

Francisci.  (Id.)

On April 19, 1989, between the hours of 9:00 PM and 9:45 PM,

several incidents took place in New York's Central Park (the

"Park").[4]  (Salaam Compl. ¶¶ 25-26, 28.)  These incidents were

reported to the police.  (McCray Compl. ¶ 35.)  At 9:05 PM, a

group of youths accosted Michael Vigna on the East Drive of the

Park, near the 102nd Street transverse.  (DA Defs.' Mot. to Dis.

Exh. E at 3.)  Minutes later a man named Antonio Diaz was

assaulted, robbed and left unconscious, also on the East Drive,

---

[4] The Court recognizes that Plaintiffs' pleadings describe these
events as taking place between 9:00 PM and 9:30 PM. (Salaam Compl.
¶¶ 25-26, 28.) However, the Court takes judicial notice of the Nancy
Ryan Affirmation in Response to Motion to Vacate Judgment of
Conviction, which provides a more detailed time line of events. (DA
Defs.' Mot. to Dis. Exh. E at 3.)

around 102nd Street. (Id.)  Between approximately 9:12 PM to 9:15 PM, a couple on a tandem bicycle was menaced just south of the 102nd Street entrance to the Park; just afterward, slightly south of that, rocks were thrown at a cab and the driver was threatened. (Id.)  Then, between 9:24 PM and approximately 9:45 PM, a series of four male joggers were chased on the jogging path at the northern end of the Park reservoir; two of them, Robert Garner and John Loughlin were assaulted.  (Id.)  Garner was not seriously hurt, but Loughlin was seriously injured. (Id.)

Plaintiffs Raymond Santana and Kevin Richardson were among a group of youths who were spotted on the western outskirts of the Park, near 100th Street and Central Park West, by officers responding to reports about the above-described incidents. (McCray Compl. ¶ 35.)  Santana and Richardson were among a number of youths apprehended.  (Id.)  In the course of this apprehension, Plaintiffs allege authorities used unnecessary and excessive force.  (Id.)  Over the next 24 to 48 hours, Santana and Richardson were allegedly interrogated by numerous teams of people, including but not limited to Detectives Ramon Rosario, Carlos Gonzalez, Harry Hildebrandt, Michael Sheehan, John Hartigan, Thomas McKenna, Humberto Arroyo, Scott Jaffer, John O'Sullivan, John Taglioni, Bill Kelly, Robert Nugent, Thomas

8

McCabe and Assistant District Attorney Linda Fairstein.  (McCray
Compl. ¶ 35.)

Hours after the apprehension of Santana and Richardson, at
approximately 1:30 AM on the morning of April 20, 1989, Patricia
Meili was found unconscious by two men walking on a footpath in
the Park.  (McCray Compl. ¶ 34; Salaam Compl. ¶ 27; Wise Compl.
26.)  Meili had been brutally beaten about the head and eyes; she
suffered numerous bruises, scratches, and abrasions elsewhere on
her body.  (Id.)  She lost significant amounts of blood. (Id.)
Her tee shirt was rolled into a ligature and used to tie her
body.  (Id.)  Meili was taken to the hospital. (Id.)  Subsequent
investigation confirmed that she had been raped.  (Id.)  At that
time, Meili was 29 years old; she is Caucasian.  (Id.)  The
attack on Meili took place near the location where the April 17,
1989 rape occurred and the two attacks had some common
characteristics.  (McCray Compl. ¶ 43; Wise Compl. ¶ 41; Salaam
Compl. ¶ 43.)

At some point between the incidents in the Park and April
20, 2007, other youths in police custody identified Plaintiffs
McCray, Wise, and Salaam as being present in the Park on the
evening of April 19, 1989.  (McCray Compl. ¶ 36; Wise Compl. ¶
28.)  On April 20, 1989, McCray, Wise and Salaam were brought to

9

the station house for questioning. (McCray Compl. ¶ 36; Wise
Compl. ¶ 28; Salaam ¶ 42.)  Over the next 24 to 48 hours, McCray
and Wise were also questioned by police officers, detectives, and
representatives of the District Attorney's Office, including many
of the above-named defendants.  (McCray Compl. ¶ 37; Wise Compl.
¶ 29; Salaam Compl. ¶ 40.)  Plaintiff Salaam was also questioned.
(Salaam Compl. ¶ 34.)  Plaintiffs claim that the questioning was
prolonged and coercive and it was exploitative of Plaintiffs'
youth and of Plaintiffs' and Familial Plaintiffs' lack of
familiarity with the criminal justice system.  (McCray Compl. ¶
38; Wise Compl. ¶ 30; Salaam Compl. ¶¶ 34, 40.)  Interrogators
allegedly isolated, intimidated and manipulated Plaintiffs; they
were suggestive and deceitful, they made false promises to
Plaintiffs and they shaped the contents of Plaintiffs' statements
before those statements were formally recorded.  (Id.)
Plaintiffs were sleep deprived.  (Id.)  Defendants also
manipulated Plaintiffs and their family members, "turning the
family members into interrogators."  (McCray Compl. ¶ 38; Wise
Compl. ¶ 30.)

Plaintiffs further allege that the questioning of Plaintiffs
McCray, Santana and Richardson was partly conducted without the
presence of family advisors.  (McCray Compl. ¶ 37.)  No audio or

10

video recordings were made of the interrogation process until rehearsed statements were videotaped at the end of the questioning.  (Id.)  Plaintiff Wise was allegedly told what facts to put into his written statements and information was withheld from him and his family.  (Wise Compl. ¶¶ 30-31.)  Wise and his family members claim they were misled about the purpose of the questioning; Wise was interrogated by one or more authorities for hours, outside the presence of his mother; she, in turn was allegedly deceived by other officers regarding the location of the precinct where her son was being questioned.  (Wise Compl. ¶ 31.)

Plaintiff Salaam's mother, aunt and "'big brother'," an Assistant United States Attorney, were each present in the precinct while he was being questioned but he was not permitted to see them.  (Salaam Compl. ¶ 34.)  Salaam's mother, aunt and "'big brother'" each attempted to see him and to stop authorities from conducting any questioning of him.  (Id.)  They were stopped by Assistant District Attorneys Linda Fairstein and Elizabeth Lederer and not allowed to see Salaam or to prevent his questioning. (Id. ¶ 35.)

Plaintiffs McCray, Richardson, Santana and Wise made inculpatory statements to Defendants describing their involvement

in the attack on Meili.   (McCray Compl. ¶ 38; Wise Compl. ¶ 30.)
Each gave videotaped statements and signed written statements in
the presence of the Defendants.   (McCray Compl. ¶ 38; Wise Compl.
¶ 33.)   Plaintiff Salaam submits only that it is alleged,
presumably by Defendants, that he made an inculpatory unsigned
statement.[5]   (Salaam Compl. ¶ 34.)

Plaintiffs allege there were numerous indications that
Plaintiffs' statements regarding the attack on Meili were not
based on actual guilt, yet Defendants failed to inquire into
those indications which signaled that the statements were false
confessions.   (Wise Compl. ¶ 37.)   Broadly, those indications can
be grouped into three categories:   those based on evidence of
coercion, those based on weaknesses in the statements, and those
based on evidence of another, more likely suspect.

Plaintiffs allege that, in spite of signs that coercive
tactics were used during the questioning of Plaintiffs,
Defendants failed to investigate and take steps to ensure that
those statements were not products of that coercion.  (Id.)
Defendants' failure to inquire into those aspects of the
statements which pointed to coercion was deliberate.   (Id.)

---

[5] None of the Plaintiffs admitted to penetrating or hitting Meili;
however, each named another person or persons in the group as having
penetrated Meili during the rape, and each made himself a possible
accomplice to the crimes committed against her.   (McCray Compl. ¶ 38;
Wise Compl. ¶ 30; Salaam Compl. ¶ 41.)

12

Instead, Defendants allegedly conspired to make use of false confessions and to cover-up indications that the statements were products of coercion.  (Id.)

Second, an additional sign that Plaintiffs' statements were not based on actual guilt as to rape-related crimes was that the statements had glaring inconsistencies and weaknesses.  (McCray Compl. ¶ 39; Wise Compl. ¶ 38; Salaam Compl. ¶ 42.)  These frailties should have raised doubt about and negated probable cause to arrest.  (Salaam Compl. ¶ 42.)  The value of the statements for purposes of establishing probable cause was undercut by two major shortcomings.  Each statement differed from the other statements regarding crucial details.  (McCray Compl. ¶ 39; Salaam Compl. ¶ 42.)  The statements were also inconsistent with the specific facts, or physical evidence, of the crime. (McCray Compl. ¶¶ 39-40; Wise Compl. ¶ 38; Salaam Compl. ¶ 42.)

Plaintiffs' accounts of the attack on Meili conflicted with one another over the specific details of, according to the District Attorney's Office in 2002, "virtually every major aspect of the crime."  (DA Defs.' Mot. to Dis. Exh. E at ¶ 86.)  These major details included information regarding who initiated the attack, who knocked Meili down, who held her, who undressed her, who struck her, who penetrated her, what weapons were used during

13

the attack, the location of the attack, the time of the attack, and when in the sequence of events the attack took place.  (Id.; McCray Compl. ¶ 39; Wise Compl. ¶ 32; Salaam Compl. ¶ 42.)

The statements were also inconsistent with facts of the crime.  (McCray Compl. ¶ 40; Wise Compl. ¶ 38; Salaam Compl. ¶ 42.)  For example, according to Wise's statement, "Steve ripped her pants off with his knife. …Um-- Steve was using the knife to cut up, cut her legs.  I don't know how he was doing it, but he was using it to cut, cut her legs.  Half of them was using their nails to cut her legs."[6]  (City Defs.' Mot. To Dis. Exh. X.) However, Meili's clothes were not cut off, and there were no knife wounds on her body.  (McCray Compl. ¶ 40; Salaam Compl. ¶ 42.)  According to Richardson's statement, "they ripped [Meili's bra] off." (City Defs.' Mot. To Dis. Exh. Q.)  In fact, the bra was still on her when she was found.  (McCray Compl. ¶ 40; Wise Compl. ¶ 38; Salaam Compl. ¶ 42.) Santana's statement describes Meili as naked when they left her, but she was still wearing a bra and her tee shirt was tied around her head.  (Id.)

---

[6] Based on review of the record, including submissions of the DA Defendants, it appears the "Steve" Plaintiff Wise was referring to was Steve Lopez.  Mr. Lopez was another youth who was present in the Park that evening, but he refused to make any inculpatory statements. Lopez was not charged with any rape-related crimes.

14

In addition, the statements contradicted the physical evidence; for example, Meili lost significant amounts of blood, and according to Wise's statement, taken after he viewed the crime scene, "blood was scattered all over the place." (McCray Compl. ¶ 41; Wise Compl. ¶ 39; Salaam Compl. ¶ 43; City Defs.' Mot. to Dis. Exh. X; Pls.' Mem. Law at 29.)  Yet none of the five teenaged boys had Meili's blood on them; no blood implicated any of the Plaintiffs in the crimes against her.[7]  (Id.)  In addition, according to Richardson's statement, "they dragged her right over there to the bushes."  (City Defs.' Mot. to Dis. Exh. Q.)  However, the impression left on the ground where Meili was dragged measured 40 feet long and no more than 16 to 18 inches wide, which was more consistent with a single attacker dragging a body than a group of teenage boys.  (McCray Compl. ¶ 41; Wise Compl. ¶ 39; Salaam Compl. ¶ 43.)

The third basis for a conclusion that Plaintiffs' statements were not based on actual guilt was that Defendants were aware of, or reasonably should have been aware of, a much more likely suspect in the attack on Meili.  (McCray Compl. ¶ 43; Wise Compl. ¶ 41; Salaam ¶ 45.)  Defendants were aware that a Central Park

---

[7] The Court takes judicial notice that notes from a Defendant Officer indicate that Kharey Wise stated, "in substance, that he had washed his clothes after the night of April 19, 1989." (City Defs.' Mem. Law at Exh. X.)

rape and assault, which happened two days earlier than the Meili attack, in a nearby location, was committed by a single assailant.  (Id.)  Around the same time that they were eliciting statements from Plaintiffs regarding the attack on Meili, Defendants allegedly were aware that a man named Matias Reyes had been treated at an area hospital for an injury which was described by the victim of the April 17th attack.  (Id.) Defendants purposefully failed to connect Reyes to the Meili attack at the time of Plaintiffs' arrest and interrogation because Defendants allegedly did not want to undermine the integrity of Plaintiffs' prosecution.  (McCray Compl. ¶ 43; Wise Compl. ¶ 41; Salaam ¶ 45.)  Pursuing the prosecution of Plaintiffs was allegedly beneficial to Defendants' careers. (Id.)

In spite of the alleged evidence of coercion, the weaknesses of the statements, and Defendants' awareness of a more likely suspect for the attack on Meili, on May 4, 1989, Plaintiffs McCray, Richardson and Santana were indicted by a New York County Grand Jury.  The indictment charged Plaintiffs for crimes relating to the incidents in Central Park which occurred between 9:00 PM and 9:45 PM, as well as for crimes relating to the attack on Meili.[8]  (McCray Compl. ¶ 45.)  According to the District

_____

[8] Plaintiffs were charged with Attempted Murder in the Second Degree; Rape in the First Degree; Sodomy in the First Degree; Sexual Abuse in the First Degree; two counts of Assault in the First Degree; Robbery

**16**

Attorney's Office, Plaintiffs Wise and Salaam were indicted with the same instrument.  (DA Defs.' Mot. to Dis. Exh. E ¶ 11.)

In August of 1989, subsequent to the indictment of Plaintiffs, but prior to the start of their trials, authorities questioned Matias Reyes about numerous sexual assaults he was suspected of perpetrating. (McCray Compl. ¶ 65; Wise Compl. ¶ 58; Salaam Compl. ¶ 60.)  Among the officers who questioned Reyes were the same Defendants who investigated, or were aware of, the April 17th rape and attack in the Park, including Defendants Michael Sheehan and Bruno Francisci.  (Id.)  Reyes' DNA was taken and matched to several sexual assaults that occurred in the spring and summer of 1989, all of which occurred in residential buildings, near the area of the Park where Meili was attacked. (Id.)  Prior to the start of the Plaintiffs' trials, Reyes pleaded guilty to several of these rapes and sexual assaults. (Id.)

Further, many of these crimes allegedly had characteristics similar to the attack on Meili, including the manner in which the victims were battered in the eyes and face, and the manner in which a victim was tied.  (McCray Compl. ¶ 76; Wise Compl. ¶ 60;

in the First Degree; two count of Robbery in the Second Degree; three counts of Assault in the Second Degree; and Riot in the First Degree. (McCray Compl. ¶ 45.)  These charges were in relation not only to the attack on Meili, but also to the other events which took place in Central Park on the night of April 19, 1989.

17

Salaam 62.)  Defendants had Reyes' DNA evidence in these crimes.
(McCray Compl. ¶ 65; Wise Compl. ¶ 58; Salaam Compl. ¶ 60.)
Thus, at this point, before proceeding to trial against
Plaintiffs, Defendants were in possession of evidence which would
have demonstrated Reyes' guilt of the crimes against Meili, and
correspondingly, Plaintiffs' innocence of those crimes.  (McCray
Compl. ¶¶ 72-76; Wise Compl. ¶¶ 57-58, 60;  Salaam Compl. ¶¶ 59-
60, 62.)  Given the evidence as it existed in August of 1989,
Plaintiffs claim Defendants should have at least concluded that a
single assailant raped and attacked Meili.  (McCray Compl. ¶ 75.)

     Plaintiffs allege that, not only did Defendants deliberately
fail to investigate appropriately this evidence, Defendants
failed to record it in official NYPD forms, or, if recorded, it
was kept from Plaintiffs' counsel during the prosecution of
McCray, Richardson, Santana, Wise, and Salaam.  (McCray Compl. ¶
72.)  Defendants concealment and failure to disclose this
evidence put the public at great risk.  (McCray Compl. ¶ 68.)
This conduct allegedly limited Plaintiffs' opportunity to argue
at trial a theory of the case different from the theory put
forward by DA Defendants and testified to by City Defendants.[9]
(Id.)

---

[9] At the time of trial, Plaintiffs were in possession of evidence from
the Defendants that none of the Plaintiffs' DNA matched that found on
the rape victim.  (DA Defs.' Mot. to Dis. Exh. E. ¶ 99.)

18

Plaintiffs pleaded not guilty to the indictments entered against them.  (Salaam Compl. ¶¶ 29-30.)  Plaintiffs moved to suppress evidence, including their inculpatory statements.  On February 23, 1990, after a hearing at which 29 witnesses were called by The People on their direct case and some of the Plaintiffs to this action and their family members testified for the Defense, Justice Thomas B. Galligan made findings that Plaintiffs' arrests were properly supported by probable cause, and that all but one of Plaintiffs statements to police were made voluntarily, knowingly and without coercion.  (DA Defs.' Mot. to Dis., Exh. C at 94-95.)

Plaintiffs were prosecuted in two separate trials.  (Salaam Compl. ¶¶ 29-30).  Plaintiffs McCray, Santana, and Salaam were tried together.  (Id.)  Then, Plaintiffs Richardson and Wise were tried jointly in a second trial.  (Id.)  At the trials, the statements elicited from Plaintiffs McCray, Richardson, Santana and Wise were admitted into evidence.  (McCray Compl. ¶¶ 46-47; Wise Compl. ¶ 43.)  Plaintiff Salaam's unsigned statement was also produced at the criminal trial and used as evidence against him.  (Salaam Compl. ¶ 34.)  The statements elicited from Plaintiffs, including the unsigned statement attributed to Salaam, were critical to obtaining convictions against them.

19

(McCray Compl. ¶¶ 46-47; Wise Compl. ¶ 43; Salaam Compl. ¶ 34; DA Defs.' Mot. to Dis. Exh. E ¶ 116.)

On April 18, 1990, the jury returned guilty verdicts against Plaintiffs McCray, Santana, and Salaam for crimes relating to the attack on Patricia Meili, as well as for crimes relating to the various incidents which occurred in Central Park.[10]  On December 11, 1990, Plaintiff Richardson was convicted on every count with which he was charged; Plaintiff Wise was convicted on all counts except the charge of Attempted Murder.  (McCray Compl. ¶ 47; Wise Compl. ¶ 43.)

Because McCray, Santana and Salaam were each under 16 years of age, the trial court set aside all convictions except First Degree Robbery and Rape.  (McCray Compl. ¶ 46.)  As a juvenile, Salaam was sentenced to an aggregate term of five to ten years. (Salaam Compl. ¶ 32.)  According to the District Attorney's Office, McCray and Santana were likewise sentenced to aggregate terms of between five and ten years.  (DA Defs.' Mot. to Dis. Exh. E ¶ 20.)

---

[10] Specifically, Plaintiffs McCray, Santana and Salaam were convicted of one count of Assault in the First Degree and Rape in the First Degree for the attack on Meili; Robbery in the First Degree and three counts of Assault in the Second Degree for the attack on John Laughlin (one of the male joggers assaulted on April 19, 1989); Assault in the First Degree for the attack on David Lewis (another jogger from that night); and Riot in the First Degree.  (McCray Compl. ¶¶ 33, 46; Salaam Compl. ¶¶ 26, 31.)  The jury acquitted McCray, Santana and Salaam of Attempted Murder and Sodomy.  (DA Defs.' Mot. to Dis. Exh. E ¶ 20.)

Because Richardson was under 16 years of age, the trial court set aside all his convictions except Attempted Murder in the Second Degree, Robbery in the First Degree, Rape, and Sodomy. (McCray Compl. ¶ 47.)  According to the District Attorney's Office, Richardson was sentenced as a juvenile to an aggregate term of five to ten years in prison;  Wise was sentenced as an adult to an aggregate term of five to fifteen years in prison. (DA Defs.' Mot. to Dis.  Exh. E ¶¶ 21- 22.)

McCray's convictions were affirmed by the Appellate Division, and the Court of Appeals denied leave to appeal.  He served seven and a half years in prison.  (McCray Compl. ¶ 48.) Richardson's conviction was also affirmed by the Appellate Division.  He served seven years in prison.  (McCray Compl. ¶ 49.)  Santana did not perfect an appeal of his conviction.  He served seven years in prison.  (McCray Compl. ¶ 50.)  Wise's conviction was affirmed by the Appellate Division, and the Court of Appeals denied leave to appeal.  He served over 13 years in prison.  (Wise Compl. ¶ 44.)  Salaam's conviction and sentence were affirmed by both the Appellate Division and the Court of Appeals.  He served six years and eight months in prison. (Salaam Compl. ¶ 37.)  Following their release from prison, Plaintiffs were each required to register as sex offenders.

21

(McCray Compl. ¶¶ 48-50; Wise Compl. ¶ 44; Salaam Compl. ¶ 37.) Throughout their incarceration and after their release, Plaintiffs consistently denied any involvement in the attack on Meili.  (McCray Compl. ¶ 51; Wise Compl. ¶ 45; Salaam Compl. ¶ 47.)

In January, 2002, Matias Reyes informed law enforcement personnel that he was solely responsible for the crimes against Meili.  (McCray Compl. ¶ 52; Wise Compl. ¶ 46, Salaam Compl. ¶ 51.)  Reyes made this statement while in prison, where he is serving sentences of 33 ⅓  years to life imprisonment as a serial rapist.  (Id.)  In response to Reyes' confession, the District Attorney's Office opened an investigation into the credibility of his statement.  (McCray Compl. ¶ 55; Wise Compl. ¶ 49, Salaam Compl. ¶ 51.)

In the course of this investigation, Reyes offered additional evidence that established that he alone perpetrated the attack on Meili.  (McCray Compl. ¶ 56; Wise Compl. ¶ 50; Salaam Compl. ¶ 52.)  This evidence included a description of the victim's radio headset and keys, which were allegedly never mentioned by any of the Plaintiffs.  (Id.)  The investigation also resulted in scientific test results which undermined the

22

probative value of evidence presented at trial against Plaintiffs
(Id.)

On May 8, 2002, the District Attorney's Office was notified
that DNA on both a sock found at the original crime scene and on
the cervical swab taken from Meili matched Reyes' DNA.  (McCray
Compl. ¶¶ 53, 57; Wise Compl. ¶¶ 47, 49; Salaam Compl. ¶¶ 49,
64.)  Additionally, previously untested semen found on the sock
established that Reyes was the source to a factor of one in
6,000,000,000 people.  (McCray Compl. ¶ 57; Wise Compl. ¶ 51;
Salaam Compl. ¶ 53.)  The District Attorney's Office also re-
tested forensic evidence against Plaintiff Richardson, which was
used at trial to link him to the attack.  (McCray Compl. ¶ 58;
Salaam Compl. ¶ 54.)  Upon reexamination, a forensic expert
contradicted the expert opinion offered at trial.[11]  (Id.)

This evidence was also consistent with the pattern of Reyes'
other sexual attacks, corroborating his claim that he alone
attacked Meili.  (McCray Compl. ¶ 63; Wise Compl. ¶ 56; Salaam
Compl. ¶ 58.)  Reyes consistently targeted women who appeared
Caucasian, he always robbed victims, and he severely beat them

---

[11] Regarding the retesting of the three hairs found on Plaintiff
Richardson which were originally admitted as evidence against
Plaintiffs at trial, none of the DNA extracted from the hairs matched
Meili's. (DA Defs.' Mot. to Dis. Exh. E at 40.)  However the official
finding with respect to each hair is that results are "inconclusive".
(Id.)

about the face and eyes so they would be unable to identify him.
(Id.)   These characteristics were all present in the crime
against Meili.   (Id.)   Reyes also tied one of his other victims
in a manner very similar to the way Meili was bound. (Id.; DA
Defs.' Mot. to Dis. Exh. E at 51.)

In September, 2002, based upon this newly discovered
evidence indicating that Reyes' confession was credible,
Plaintiffs filed motions to vacate the judgments of conviction
against them.   (McCray Compl. ¶ 54; Wise Compl. ¶ 48; Salaam
Compl. ¶ 50.)   The newly discovered evidence included Reyes'
claims that he alone attacked and raped Meili, his accounts of
the events, and the DNA test results linking Reyes to the crime
scene.   (McCray Compl. ¶ 55; Wise Compl. ¶ 49; Salaam Compl. ¶
51.)   The District Attorney's Office conceded the veracity of the
new evidence.   (Id.)   The District Attorney's Office joined
Plaintiffs in requesting that the trial court vacate judgments of
conviction against Plaintiffs and informed the trial court that,
if their convictions were vacated, the State would voluntarily
move to dismiss Plaintiffs' indictments.   (DA Defs.' Mot. to Dis.
Exh. E at ¶ 119.)

Meanwhile, on November 1, 2002, Defendant Police
Commissioner Raymond Kelly announced the establishment of the

"Armstrong Commission." (McCray Compl. ¶ 78; Wise Compl. ¶ 71; Salaam Compl. ¶ 71.) Led by former Assistant District Attorney and Assistant United States Attorney Michael Armstrong, this Commission purported to evaluate the propriety of police conduct in the arrests and interrogations of Plaintiffs and in the investigation of events of April 19, 1989.[12]  (Id.)

On December 19, 2002, Justice Charles J. Tejada of the New York County Supreme Court, upon the consent of the District Attorney's Office, granted Plaintiffs' motions for vacatur and remanded for a new trial. People v. Wise, 752 N.Y.S.2d 837 (2002); (McCray Compl. ¶ 66; Wise Compl. ¶ 59; Salaam Compl. ¶ 41.)

On January 27, 2003, the Armstrong Commission issued its report (hereinafter, the "Armstrong Report").[13]  (McCray Compl. ¶

---

[12] "Our task was to provide an overview for the investigation of these events, determine whether the new evidence indicated that police supervisors or officers acted improperly or incorrectly, identify any possible weaknesses in Police Department procedures and make recommendations to address any failures or weaknesses. The panel relied heavily upon police personnel assigned to assist in the review of this matter." (City Defs.' Mot. to Dis. Exh. N at 1.)

[13] The Commission relied on the Plaintiffs' written and videotaped statements, and transcripts thereof; notes of Detectives' interviews; The People's papers in Opposition to Plaintiffs' Motions to Suppress Evidence; the transcript of Justice Galligan's pre-trial hearing; Justice Galligan's decision on the Motions to Suppress; Plaintiffs' Motion to Vacate the Judgments against them; the Nancy Ryan Affirmation; Justice Tejada's decision granting vacatur; 1989 crime scene photographs and area map; Parole Board hearing transcripts; and the results of FBI forensic tests. (City Defs.' Mot. to Dis. Exh. N at 11.)

25

93.)   The Armstrong Report concluded that the New York City
Police Department properly interrogated Plaintiffs and was not
accountable for failing to connect Reyes to the attack on Meili
prior to his confession. (McCray Compl. ¶ 78; Wise Compl. ¶ 73;
Salaam Compl. ¶ 72.)   The Commission further concluded:

> We conclude that the various inconsistencies
> in defendants' statements, and the other
> recently revealed weaknesses in the evidence
> presented at trial, when viewed in the light
> of Reyes's claim that he alone attacked the
> jogger, could afford a reasonable basis for
> maintaining that Reyes did, indeed, commit an
> attack on the jogger by himself.
>
> However, the consistencies found in the
> defendants' statements, the informal remarks
> made by the defendants at various times, the
> corroborative testimony of other witnesses,
> the absence of a convincing motive for Reyes
> and suspicion of his general credibility,
> lead us to conclude that it is more likely
> than not that the defendants participated in
> an attack upon the jogger.
>
> We adopt the view that the most likely
> scenario for the events of April 19, 1989 was
> that the defendants came upon the jogger and
> subjected her to the same kind of attack,
> albeit with sexual overtones, that they
> inflicted upon other victims in the park that
> night.  Perhaps attracted to the scene by the
> jogger's screams, Reyes either joined in the
> attack as it was ending or waited until the
> defendants had moved on to their next victims
> before descending upon her himself, raping
> her and inflicting upon her the brutal
> injuries that almost caused her death.

26

> On this theory of the facts, there is no
> reason to believe that the defendants were
> prompted into making erroneous statements.

(McCray Compl. ¶ 79; Wise Compl. ¶ 74; Salaam Compl. ¶ 73; City
Defs.' Mot. to Dis. Exh. N at 41.)  By accepting these findings,
Defendant Commissioner Kelly ratified the allegedly wrongful
conduct of City Defendants. (McCray Compl. ¶ 80; Wise Compl. ¶
75; Salaam Compl. ¶ 74.)  Additionally, in establishing the
Commission, publishing the Armstrong Report and accepting its
findings, Defendants participated in a conspiracy; the aims of
this conspiracy were to propound the belief that Plaintiffs are
in fact guilty of the attack on Meili, to brand publicly
Plaintiffs as rapists, and to absolve the New York City Police
Department of liability. (McCray Compl. ¶¶ 77, 81; Wise Compl. ¶¶
70, 72; Salaam Compl. ¶ 71.)

     Plaintiffs allege that Defendants' conduct caused Plaintiffs
grievous permanent injury.  (McCray Compl. ¶¶ 81, 82; Wise Compl.
¶¶ 76, 77; Salaam Compl. ¶¶ 75-77.)  Injury to Plaintiffs and
Familial Plaintiffs include years of imprisonment during their
formative ages, and the attendant loss of freedom; damage to
their intimate familial relationships, loss of companionship and
income; mental and physical pain; suffering, anguish, fear;
humiliation and defamation of character and reputation. (Id.)

## II. DISCUSSION

### A. Motion to Dismiss Standards

#### 1. The Fed. R. Civ. P. 12(b)(1) Standard

On a motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(1), for lack of subject matter jurisdiction, the
court must assume all factual allegations in the Complaint to be
true.  Jaghory v. New York State Dep't of Educ., 131 F.3d 326,
329 (2d Cir. 1997).  However, the Court may also consider matters
outside the pleadings in deciding a jurisdiction question, as
long as they are not merely conclusory or hearsay statements.
J.S. ex rel. N.S. v. Attica Central Schools, 368 F.3d 107, 110
(2d Cir. 2004).  Thus, although a motion to dismiss for lack of
subject-matter jurisdiction cannot be converted into a summary
judgment motion, the court may look to Federal Rule of Civil
Procedure 56 for guidance in evaluating a 12(b)(1) motion.
Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir. 2004).

#### 2. The Fed. R. Civ. P. 12(b)(6) Standard

The purpose of a motion to dismiss pursuant to Fed. R. Civ.
P. 12(b)(6) is to "test, in a streamlined fashion, the formal
sufficiency of the plaintiff's statement of a claim for relief
without resolving a contest regarding its substantive merits."

28

Global Network Communications, Inc. v. City of New York, 458 F.3d
150, 155 (2d Cir. 2006). On such a motion, the court "assesses
the legal feasibility of the complaint, but does not weigh the
evidence that might be offered to support it." Id. (citing
AmBase Corp. v. City Investing Co. Liquidating Trust, 326 F.3d
63, 72 (2d Cir. 2003)). The court therefore "must accept as true
all of the factual allegations set out in plaintiff's complaint,
draw inferences from those allegations in the light most
favorable to plaintiff, and construe the complaint liberally."
Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (quoting Conley
v. Gibson, 355 U.S. 41, 45-46 (1957)). However, "[d]ocuments
that are attached to the complaint or incorporated in it by
reference are deemed part of the pleading and may be considered."
Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (citing Pani
v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998),
cert. denied, 525 U.S. 1103 (1999)).

Federal Rule of Civil Procedure 8(a)(2) provides that civil
complaints "shall contain... a short and plain statement of the
claim showing that the pleader is entitled to relief." The
Supreme Court has explained that Rule 8(a)(2) requires that a
complaint's "[f]actual allegations must be enough to raise a
right to relief above the speculative level, on the assumption

29

that all the allegations in the complaint are true...." <u>Bell Atlantic v. Twombly</u>, 127 S.Ct. 1955, 1965, (2007) (internal citations omitted).  However, under Rule 8(a)(2), "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the... claim is and the grounds upon which it rests.'" <u>Erickson v. Pardus</u>, 127 S.Ct. 2197, 2200 (2007) (per curiam) (citations omitted).  Thus, on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "the bottom-line principle is that 'once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.'" <u>Roth</u>, 489 F.3d at 510 (quoting <u>Bell Atlantic</u>, 127 S.Ct. at 1969).  "In order to withstand a motion to dismiss, a complaint must plead, 'enough facts to state a claim for relief that is plausible on its face.'" <u>Patane v. Clark</u>, No. 06-3446-CV, 2007 WL 4179838, at *3 (2d Cir. Nov. 28, 2007).

B. <u>Motion to Dismiss Pursuant to Defendants' 12(b)(1) Motion</u>

    1. <u>Rooker-Feldman Doctrine</u>

DA Defendants argue that this Court does not have subject matter jurisdiction to hear Plaintiffs' federal claims for false arrest and imprisonment, pursuant to the <u>Rooker-Feldman</u> doctrine. (DA Defs.' Mem. Law at 28.)  City Defendants maintain that the

Rooker-Feldman doctrine acts as a complete bar to any of
Plaintiffs' § 1983 claims, inasmuch as they rely on allegations
of lack of probable cause and coerced confessions.   (City Defs.'
Mem. Law at 31.)

     In Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16
(1923), and in District of Columbia Court of Appeals v. Feldman,
460 U.S. 462, 482-86 (1983), the Supreme Court held that a United
States District Court has no authority to challenge effectively
judgments of a state court, except as provided by Congress; for
example, pursuant to an application for a writ of habeas corpus.
The premise of the doctrine is a principle of comity, according
to which, "[l]ower federal courts possess no power whatever to
sit in direct review of state court decisions."   Atlantic Coast
Line R.R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S.
281, 296 (1970).   Rooker-Feldman bars lower federal courts from
exercising jurisdiction over claims that were actually litigated
in state court as well as those, "inextricably intertwined" with
state court determinations.   See, Vargas v. City of New York, 377
F.3d 200, 205 (2d Cir. 2004); Moccio v. N.Y. State Office of
Court Admin., 95 F.3d 195, 199-200 (2d Cir. 1996).

     Although the Supreme Court has afforded "little guidance in
determining when claims are 'inextricably intertwined'," Phifer

31

v. City of New York, 289 F.3d 49, 55 (2d Cir. 2005),   Exxon Mobil
Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005), did
narrow the doctrine of Rooker-Feldman.   In Exxon Mobile, the
Supreme Court limited the reach of Rooker-Feldman to, "cases
brought by state-court losers complaining of injuries caused by
state-court judgments rendered before the district court
proceedings commenced and inviting district court review and
rejection of those judgments."  Id. at 284.

    In Hoblock v. Albany Cty. Board of Elections, 422 F.3d 77
(2d Cir. 2005), the Second Circuit set forth a four-pronged test
for determining whether Rooker-Feldman limits a district court's
subject matter jurisdiction.  Under that test, to apply Rooker-
Feldman, (1) the federal court plaintiff must have lost in state
court; (2) the plaintiff must be complaining of injuries caused
by the state court judgment; (3) the plaintiff's complaint must
invite the district court's review and rejection of that state
court determination; and, (4) the state court judgment must have
been rendered prior to the start of district court proceedings.
Hoblock, 422 F.3d at 85.

    On the unique facts of this case, however, it is apparent
that the Rooker-Feldman doctrine cannot apply.  As Plaintiffs
correctly point out, "[The Rooker-Feldman] doctrine has no

applicability to civil rights claims which do not challenge any
state court determinations." (Pls.' Mem. Law at 42.) All of the
cases discussing the applicability of Rooker-Feldman involve
cases where the judgment being challenged is extant and
controlling.[14] In that the judgments in these cases were vacated
and remanded, and the Defendants moved to dismiss the
Indictments, it is not clear what judgment remains to call

---

[14] City Defendants cite no authority to support explicitly their
argument that, "[T]he decision granting vacatur of the convictions
based upon the newly discovered Matias Reyes evidence does not, in any
way, invalidate Jsutice [sic] Galligan's ruling." (City Defs.' Rep.
Mem. Law at 28, n.22). City Defendants reply to Plaintiffs' argument
that Rooker-Feldman is inapplicable because Plaintiffs do not
challenge any state court determinations (as the jury convictions were
vacated) by citing authority to support their argument that, "the
Rooker-Feldman doctrine precludes Section 1983 challenges to
constitutional issues that were, as in this case, previously decided
in an underlying state court suppression hearing, regardless of the
ultimate jury determination." (Id. at 27). See e.g. O'Rourke v.
Krapf, No. 01-CV-3065, 2002 WL 32348933 (E.D.P.A. Sep. 20, 2002)
(holding that Rooker-Feldman deprived the lower federal court of
jurisdiction to consider issues that challenged the suppression ruling
in a criminal trial where a magistrate judge dismissed one count, and
a jury acquitted on remaining counts); Wishnefsky v. Addy, 969 F.
Supp. 953, 955 (E.D.P.A. 1997) (finding that Rooker-Feldman bars the
District Court from considering civil rights claims which rely on
issues raised in a previously decided suppression ruling, where the
criminal defendant was awaiting trial and the suppression ruling was
under appeal); Roe v. Johnson, 2003 U.S. Dist. LEXIS 25881 (S.D.N.Y.
2003) (holding that Rooker-Feldman bars Plaintiff Roe from seeking
lower federal court review of an interlocutory state order). These
cases are inapposite. A judgment of acquittal is not analogous to a
vacated conviction followed by a dismissal of charges. An acquittal
is a jury determination which carries legal effect; a vacated judgment
followed by a dismissal of charges necessarily means any jury
determination is void and nullified. Likewise, a state court ruling
under appeal remains a controlling determination. None of the
authorities cited by City Defendants consider an action where, as
here, the suppression judgment challenged is void of legal effect. DA
Defendants overlook the impact of the vacatur and dismissal of charges
on a Rooker-Feldman inquiry.

33

Rooker-Feldman into question.  It is axiomatic that voided state
court determinations cannot be challenged.  In order to invoke
Rooker-Feldman, "the injury such a federal suit seeks to remedy
cannot have been produced by a state court judgment that did not
exist at the federal suit's inception."  Hoblock, 422 F.3d at 88.
Given the vacatur of the judgments of conviction, and the
dismissal of charges against them, the suppression ruling against
Plaintiffs cannot be said to have existed in any legally
effective way at the inception of this federal suit.

        Moreover, it cannot be that Plaintiffs' are challenging the
vacatur and remand judgment since the Plaintiffs did not lose in
that judgment and thus would fail the first prong of Hoblock;
since the Plaintiffs suffered no injuries caused by that state
court judgment, they fail the second prong as well; the
Plaintiffs assuredly do not want this Court to reject that
court's determination, thus they fail the third prong; however,
the Plaintiffs do meet the fourth prong in that the state court
judgment was rendered before the instant proceeding was
commenced.  Accordingly, the Rooker-Feldman doctrine poses no
barrier to this Court's jurisdiction over the Complaints in this
action.  Federal subject matter jurisdiction is barred by Rooker-
Feldman only where all four Hoblock requirements are met.  See

Marshall v. Grant, No. 06-5358, 2007 WL 3307006, at *3 (E.D.N.Y. Nov. 6, 2007).

### 2. Eleventh Amendment Immunity from Suit

In this action, Plaintiffs seek money damages for alleged civil rights violations from DA Defendants acting in their official capacity as prosecutors.  DA Defendants argue that the Eleventh Amendment to the U.S. Constitution divests this Court of subject matter jurisdiction over Plaintiffs claims for money damages against state actors in their official capacity.  (DA Defs.' Mem. Law at 18.)  Plaintiffs do not refute this argument.

"When prosecuting a criminal matter, a district attorney in New York represents the state, not the county."  Alvarez v. Doe, No. 03 Civ. 7740, 2004 WL 1874972, at *4 (S.D.N.Y. Aug. 13, 2004) (citing Ying Jing Gan v. City of New York, 996 F.2d 522, 529-30 (2d Cir. 1993)).  Where a state official is sued in his official capacity, such a suit is deemed to be against the state and the official is entitled to invoke the immunity belonging to the state.  Kentucky v. Graham, 473 U.S. 159, 166-67, 169 (1985).  It is well settled that the State is not a "person," subject to § 1983 claims.  See K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health of State of New York, 189 F.3d 273, 278 (2d Cir. 1999) (citing Will v. Michigan Dep't of State Police, 491

U.S. 58, 70-71 n.10 (1989)). Where a defendant can claim immunity from suit, the court lacks subject matter jurisdiction. The Eleventh Amendment, however, does not bar suits against state actors for prospective injunctive relief. Seminole Tribe of Fla v. Florida, 517 U.S. 44, 73 (1996).

Plaintiffs do not seek prospective injunctive relief. Because the Eleventh Amendment bars the Court from hearing claims against state actors in their official capacity, Plaintiffs' official capacity claims against DA Defendants are hereby DISMISSED WITH PREJUDICE.

C. Motion to Dismiss Pursuant to Defendants' 12(b)(6) Motion

1. Collateral Estoppel

The Defendants' arguments that the doctrines of res judicata, or collateral estoppel, or law of the case bar the Plaintiffs from raising again here issues decided against them in prior judgments also ignore the fact that, for these doctrines to apply, there must be an extant, valid judgment. A reversed judgment can have no preclusive effect. "It has long been established that when a judgment has been reversed and the case remanded for a new trial the effect is to nullify the judgment entirely and place the parties in the position of no trial having taken place." U.S. v. Lawson, 736 F.2d 835, 837 (2d Cir. 1984)

36

(explicitly noting that, in accordance with this principle, a defendant has been permitted to raise issues not raised at the first trial and to make a new pretrial motion to suppress evidence)[15]; accord, Dodrill v. Ludt, 764 F.2d 442 (6th Cir. 1983) ("The reversal vacates the judgment entirely, technically leaving nothing to which we may accord preclusive effect... When [the plaintiff] won his appeal and the judgment was vacated, all such factual determinations were vacated with it, and their preclusive effects surrendered."); see also, Ruben v. American and Foreign Insurance Co., 592 N.Y.S.2d 167 (1992) (finding that no collateral estoppel effect can be given to jury findings where a judgment is vacated).

Accordingly, the Court cannot estop Plaintiffs from litigating any of the issues previously considered in the criminal proceedings against Plaintiffs, including those relating to probable cause, and/or the voluntariness of their statements. After the vacatur of their convictions and the dismissal of charges against them, the trial court suppression ruling against Plaintiffs cannot constitute a final and valid determination.

---

[15] See generally In re Hoff's Estate, 194 Misc. 739, 740 (N.Y.Sur. 1948) ("A reversed judgment can have no effect on the parties thereto by way of collateral estoppel, and that is true even where, as here, the reversal occurred because the controversy had become moot.").

37

## 2. Statute of Limitations

City Defendants argue that all of Plaintiffs' federal claims
in this action must be dismissed as time-barred.  (City Defs.'
Mem. Law at 45-47.)  DA Defendants concede that Plaintiff's
federal claims are timely, but maintain that Plaintiffs' state
law claims for false arrest and imprisonment are time-barred.
(DA Defs.' Mem. Law at 31.)

The applicable statute of limitations for Plaintiffs' 42
U.S.C §§ 1983 and 1985 actions is three years, pursuant to N.Y.
C.P.L.R. § 214.  See Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir.
1997) (applying New York's three-year statute of limitations to §
1983 action); Meyer v. Frank, 550 F.2d 726, 728 n.5 (2d Cir.
1977) (applying New York's three-year statute of limitations to §
1985 action); Peterson v. Tomaselli, 02 Civ. 6325, 2004 WL
2211651, at *14 (S.D.N.Y. Sep. 30, 2004) (applying New York's
three-year statute of limitations to §§ 1983 and 1985 actions).

The applicable statute of limitations for Plaintiffs' 42
U.S.C § 1981 claim can be either three or four years.[16]  See Jones

---

[16] If Plaintiffs' claims are made possible by a post-1990 enactment,
such as the § 1981 amendment provided by the Civil Rights Act of 1991,
then those claims are governed by the federal "catch-all" four-year
statute of limitations set forth in 28 U.S.C. § 1658.  R.R. Donnelley
& Sons Co., 541 U.S. at  382.  Under 28 U.S.C. § 1658, "Except as
otherwise provided by law, a civil action arising under an Act of
Congress enacted after the date of the enactment of this section
[December 1, 1990] may not be commenced later than 4 years after the

v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004); Bacon v.
Suffolk Legislature, No. 05-CV-4307, 2007 WL 2288044, at *6
(E.D.N.Y. Aug. 8, 2007).  In New York, a § 1981 claim which arose
prior to a 1990 enactment is governed by a three year statute of
limitations.  Mian v. Donaldson, Lufkin & Jenrette Securities
Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).

Although New York law provides the applicable statute of
limitations for §§ 1983, 1985 and § 1981 claims arising in or
before 1990, federal law governs the question of when the claims
accrue.  See Wallace v. Kato, 127 S.Ct. 1091, 1095 (2007);
Covington v. City of New York, 171 F.3d 117, 121 (2d Cir. 1999).
Under federal law, a statute of limitations generally begins to
run, "when the plaintiff knows or has reason to know of the
injury which is the basis of his action."  Singleton v. City of
New York, 632 F.2d 185, 191 (2d Cir. 1980) (quotations and
citations omitted).

This Circuit has held that "a § 1983 cause of action for
damages attributable to an unconstitutional conviction or
sentence does not accrue until the conviction or sentence has
been invalidated."  Covington, 171 F.3d at 122 (quoting Heck v.

cause of action accrues."  Otherwise, just as with §§ 1983 and 1985
claims, the Court should apply the most analogous state statute of
limitations.

39

Humphrey, 512 U.S. 475, 489-90 (1994)). The Heck delayed accrual rule applies as well to §§ 1981 and 1985 claims. Amaker v. Weiner, 179 F.3d 48, 51-52 (2d Cir. 1999); Davis v. Ennis, No. 04-CV-3987, 2006 WL 224183, at *2 (E.D.N.Y. Jan. 30, 2006).

Plaintiffs argue that, because they have alleged fraudulent concealment and fabrication of evidence, they are entitled to the equitable tolling of their false arrest and imprisonment claims. (Pls.' Mem. Law at 49.)  The doctrine of equitable tolling is to be applied only upon a showing that "rare and exceptional circumstances" prevented a party from timely asserting his or her claim, and that the party, "acted with reasonable diligence throughout the period he sought to toll." Doe v. Menefee, 391 F.3d 147, 159 (2d Cir. 2004). "A plaintiff seeking equitable tolling of a limitations period must demonstrate that defendants engaged in a fraud which precluded him from discovering the harms he suffered or the information he needed to file a complaint." Daniel v. Safir, 175 F.Supp.2d 474, 480 (E.D.N.Y. 2001) (citing Paige v. Police Dep't of the City of Schenectady, 264 F.3d 197, 200 (2d Cir. 2001) and Pinaud v. County of Suffolk, 52 F.3d 1139, 1157 (2d Cir. 1995)).

In this case, while Plaintiffs have alleged that the Defendants engaged in fraudulent concealment, they have not shown

that this fraud precluded them from discovering that they were allegedly falsely arrested and falsely imprisoned. Plaintiffs have not explained why they were unable to assert their federal and state false arrest and imprisonment causes of action when these claims originally accrued. As a result, the Court can find no basis to toll the statute of limitations.

Moreover, with respect to § 1983 false arrest actions, accrual governed by the Heck delayed accrual rule is limited by Wallace v. Kato, 127 S.Ct. 1091 (2007). In Wallace, the Supreme Court ruled that, "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." 127 S.Ct. at 1100.

Here, Plaintiffs claim that their convictions could not have been obtained in the absence of their inculpatory statements, which they allege were products of their false arrest and imprisonment. Wallace settles that Plaintiffs' federal claims for false arrest and imprisonment accrued against Defendants no later than April 1989, when Plaintiffs were arraigned on felony complaints for the April 19, 1989 crimes.[17] Plaintiffs filed

---

[17] See Carpenter v. Hayden, No. 07-CV-6147, 2007 WL 1879662, at *3 n.1 (W.D.N.Y. June 26, 2007) (suggesting it may be appropriate to file

their federal claims in this action in 2003.  Because the time limits on their false arrest and false imprisonment claim accordingly expired three years later, in April 1992, those claims are clearly time-barred and are accordingly DISMISSED WITH PREJUDICE.[18]

The remainder of Plaintiffs' federal claims are timely.  The Heck delayed accrual rule applies to Plaintiffs' § 1983 claim for malicious prosecution.  The prosecution against Plaintiffs was favorably terminated upon the 2002 vacatur of their convictions and the dismissal of the indictments against them; as such, the filing of this 2003 action was within the statute of limitations. Since this Circuit applies the Heck rule to §§ 1981 and 1985 claims, Plaintiffs causes of action for racial discrimination and for conspiracy are timely as well.[19]

---

false arrest claims prophylactically, in response to Wallace, with the understanding that such cases must be dismissed without prejudice as premature until a conviction is successfully challenged); Bradley v. Nolan, No. 03 CV 1616, 2007 WL 959160, at *1-2 (S.D.N.Y. March 30, 2007) (applying Wallace and finding Plaintiff's false arrest claims time-barred).

[18] Plaintiffs attempt to revive their false arrest and imprisonment claims, presumably both the federal and state claims, by arguing that tolling is available where these claims are intertwined with a subsequent conviction.  (Pls'. Mem. Law at 49.)  However, Plaintiffs cite only one pre-Wallace case in support of their argument. (Id., citing Robinson v. Maruffi, 895 F.2d 649, 655 (10th Cir. 1990)).)

[19] Plaintiffs' § 1981 claim is timely regardless of whether the applicable statute of limitations in this case is three or four years.

DA Defendants challenge Plaintiffs' state law claims for false arrest and imprisonment, arguing that these claims are time-barred.  Plaintiffs do not address this argument.  Indeed, they concede that their "state law false arrest and false imprisonment claims accrued in 2000...."  (Pls.' Mem. Law at 49.)  Accordingly, these state law claims are untimely and are DISMISSED WITH PREJUDICE.[20]

### 3. Absolute Immunity

DA Defendants argue that Plaintiffs' claims are barred by the doctrine of absolute immunity.

Under the doctrine of absolute immunity, a prosecutor cannot be liable in § 1983 suits for damages when acting within the

---

[20] In New York, state claims for false arrest or imprisonment are subject to a one year and ninety day statute of limitations.  See N.Y. Gen. Mun. Law §§ 50-e, 50-i(1).  New York false arrest and imprisonment claims accrue when the claimant is released from custody, regardless of whether that release constitutes favorable termination.  See, e.g., Nunez v. City of New York, 762 N.Y.S.2d 384 (App. Div. 1965); Dailey v. Smiley, 410 N.Y.S.2d 468 (App. Div. 1978) (false arrest claims accrued on date claimant was released on bail); Caminito v. City of New York, 269 N.Y.S.2d 826, 829 (false arrest claim accrued after actual physical release upon completion of sentence).  In this case, Plaintiffs' New York state claims for false arrest and imprisonment accrued upon their release from incarceration.  Plaintiff Wise was released from prison in August 2002.  Applying New York's one year and ninety day statute of limitations, his claim expired on December 1, 2003.  Because Wise filed this action on December 16, 2003, his claims are time-barred.  Plaintiffs McCray, Richardson, Santana and Salaam were all released from custody earlier than Plaintiff Wise.  (McCray Compl. ¶¶ 101, 104; Salaam Compl. ¶ 32.)

scope of official prosecutorial duties.  Imbler v. Pachtman, 424

U.S. 409, 420 (1976); Schmueli v. City of New York, 424 F.3d 231,

236 (2d Cir. 2005).  Initiating a prosecution and presenting the

Government's case are activities "intimately associated with the

judicial phase of the criminal process."  Imbler, 424 U.S. at

410, 430-31.  Consequently, absolute immunity applies to these

prosecutorial duties with full force.  Id.

The purpose of the doctrine is to minimize the threat of §

1983 liability which would otherwise inhibit prosecutors from

exercising independent judgment and focusing on performing their

duties.  Id.; see also, Taylor v. Kavanaugh, 640 F.2d 450, 453 (2d

Cir. 1981).  Consequently it is often the case that, "[t]his

immunity does leave the genuinely wronged defendant without civil

redress against a prosecutor whose malicious or dishonest action

deprives him of liberty."  Imbler, 424 U.S. at 427.  A prosecutor

is protected by absolute immunity even if he commences and

continues a prosecution purely on the basis of retaliation,

knowingly uses perjured testimony or deliberately withholds

exculpatory information.  Schmueli v. The City of New York, 424

F.3d 231, 237 (2005) (internal citations omitted).

However, a prosecutor does not qualify for absolute immunity

where he or she acts outside his or her role as an advocate, or

44

clearly outside any colorable claim of authority.  See Buckley v.
Fitzsimmons, 509 U.S. 259, 273 (1993); Schmueli, 424 F.3d at 237.
(2005).  Thus, if a prosecutor acts in an investigative capacity,
for example; or gives police legal advice on the propriety of
investigative techniques and on whether or not probable cause
exists to make an arrest; or if a prosecutor makes statements to
the press, then absolute immunity cannot be invoked.  See Buckley,
509 U.S. at 270-271  (finding that prosecutors' cooperative
efforts with police was investigative and not protected by
absolute immunity); Burns v. Reed, 500 U.S. 478 (1991) (holding
that a state prosecutor is not entitled to absolute immunity for
giving legal advice to police); Janovic v. City of New York, No.
04 Civ. 8437, 2006 WL 2411541, at *16 (S.D.N.Y. Aug. 17, 2006)
(finding that making statements to press which are outside the
scope of official prosecutorial duties is not protected under
absolute immunity); see also, Mitchell v. Forsyth, 472 U.S. 511,
520 (1985) (finding that the Attorney General is not absolutely
immune from suit for damages resulting from allegedly
unconstitutional conduct in performing national security
functions).

DA Defendants maintain that every allegation of wrongdoing
identified by Plaintiffs constitutes conduct within the

45

prosecutorial function and, therefore, they are immune.   (DA
Defs.' Mem. Law at 19-23; DA Defs' Rep. Mem. Law at 4.)   DA
Defendants argue that since malicious prosecution claims require
the initiation of a criminal proceeding, and since the
prosecutor's decision to file criminal charges is "initiating a
prosecution," that any malicious prosecution claim as to them is
barred by absolute immunity.   DA Defendants further contend that
a "fair reading of the [C]omplaints" suggests that their
statements were taken by ADAs only after Plaintiffs confessed to
police; because probable cause was already established, DA
Defendants argue, the ADAs' conduct in taking statements from
Plaintiffs was not investigative.   (DA Def. Mem. Law at 47.)

Clearly some conduct for which Plaintiffs seek to hold DA
Defendants liable is intimately involved in the prosecutorial
function and precisely the sort of activity contemplated by the
absolute immunity doctrine.   Specifically, even if DA Defendants
did, as Plaintiffs allege, use Plaintiffs' inculpatory statements
at trial, knowing that they were false and coercively obtained,
this conduct is shielded under absolute immunity.   Schmueli, 424
F.3d at 237; Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994).
Likewise, under Imbler, Plaintiffs allegations that DA Defendants
deliberately failed to disclose exculpatory evidence cannot

**46**

expose DA Defendants to civil liability for damages. 424 U.S. at 431.

However, where ADAs themselves investigated or worked with police officers advising them on their investigative tactics, they are not entitled to absolute immunity. Buckley, 509 U.S. at 276. The burden is on the Plaintiffs to allege specifically what non-prosecutorial activities each of the DA Defendants engaged in. This is not clear from the Complaints. DA Defendants argue that because Plaintiffs McCray, Wise, Santana and Richardson allege that their questioning culminated in videotaped statements to prosecutors, under a "fair reading" of the Complaints, prosecutors only took statements from Plaintiffs after probable cause was established. (DA Defs.' Mem. Law at 47.) However, even if this were true, it is not clear that once probable cause is established, prosecutors never again can act in an investigative capacity.[21]

---

[21] DA Defendants cite only a 7th Circuit ruling, Hunt v. Jaqowski, 926 F.2d 689 (1991), for the proposition that actions taken after probable cause is established are protected by absolute immunity. DA Defendants also direct the Court to Hill v. City of New York, 45 F.3d 653, (2d. Cir. 1995), which holds that the question of whether a prosecutor, charged with fabrication of evidence after taking videotaped statements, acted in an investigatory or in an advocacy capacity could not be determined on the pleadings. However, the Court considers the Supreme Court's reasoning in Buckley, 509 U.S. at 274, n.5, controlling, "Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination… a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity."

The Court finds that DA Defendants are shielded from suit on the basis of allegations that they used fabricated evidence at trial and that they failed to disclose exculpatory material to Plaintiffs.  Accordingly, any claims raised by Plaintiffs which are predicated exclusively on such conduct are hereby DISMISSED WITH PREJUDICE.

Regarding any remaining conduct which may be non-prosecutorial, Plaintiffs are given leave to amend their Complaints to allege as to each Defendant DA what, if any, such activities DA Defendants took part in.

### 4. Qualified Immunity

City Defendants argue that Defendant Officers and Defendant Linda Fairstein are entitled to the protections of qualified immunity because their actions were attended by "arguable probable cause."  (City Defs. Mem. Law at 70-73.)  DA Defendants contend that even if Plaintiffs' claims allege conduct which is non-prosecutorial in nature, suit against them is barred because non-prosecutorial conduct is protected by qualified immunity. (DA Defs.' Mem. Law at 47-48.)

Qualified immunity shields a defendant from standing trial or facing other burdens of litigation, "if either (a) the Defendant's conduct did not violate clearly established law, or

48

(b) it was objectively reasonable for the Defendant to believe
that his action did not violate such law." Johnson v. Newburgh
Englarged Sch. Dist., 293 F.3d 246, 250 (2d Cir. 2001); Brosseau
v. Haugen, 543 U.S. 194, 198 (2004). Thus, in analyzing a
qualified immunity claim, a court must follow the sequence of
determining first, if taken in the light most favorable to
Plaintiffs, the facts alleged show that the official's conduct
violated a constitutional right. Saucier v. Katz, 533 U.S. 194,
201 (2001). Subsequently, if a violation could be made out on a
favorable view of Plaintiffs' allegations, the court must inquire
into whether that constitutional right was clearly established.
Id.

The qualified immunity doctrine can only be invoked to
protect the discretionary conduct of government officials to the
extent that such conduct does not violate clearly established
law. Ying Jing Gan v. City of New York, 996 F.2d 533, 532 (2d
Cir. 1993) (internal quotations and citations omitted). To
determine whether a right is "clearly established" a court must
consider:  (1) whether the right in question was defined with
"reasonable specificity"; (2) whether the decisional law of the
Supreme Court and the Second Circuit support the existence of the
right in question; and (3) whether under preexisting law a

49

reasonable defendant official would have understood that his
conduct was unlawful.  Id.  "[T]he contours of the right must be
sufficiently clear that a reasonable official would understand
that what he is doing violates that right."  Anderson v.
Creighton, 483 U.S. 634, 640 (1987).  "An overly narrow
definition of the right can effectively insulate the government's
actions by making it easy to assert that the narrowly defined
right was not clearly established."  LaBounty v. Coughlin, 137
F.3d 68, 73-74 (2d Cir. 1998).  At the same time, the right
cannot be defined too broadly, so as to convert effectively the
rule of qualified immunity into one of unqualified liability.
Id.

Even where a right is "clearly established," if a reasonable
official would not have understood that his conduct was within
the scope of that right, qualified immunity can be invoked.  Id.
at 73.  "[R]easonableness is judged against the backdrop of the
law at the time of the conduct.... [T]his inquiry must be
undertaken in light of the specific context of the case, not as a
broad general proposition."  Brosseau, 543 U.S. at 198.

Although qualified immunity is an affirmative defense
against suit, not simply liability,  Saucier, 533 U.S. at 200,
"'A defendant asserting a qualified immunity defense at the

12(b)(6) stage... faces a formidable hurdle.'"   McNamara v. City
of New York, No. 05 CV 6025, 2007 WL 1062564, at *9 (E.D.N.Y.
March 30, 2007) (quoting Sales v. Barizone, No. 03 CV 6691, 2004
WL 2781752, at *15 (S.D.N.Y. Dec. 2, 2004) and McKenna v. Wright,
386 F.3d 432, 434 (2d Cir. 2004)).   "Because the evidence
supporting a finding of qualified immunity is normally adduced
during the discovery process and at trial, 'the defense of
qualified immunity [usually] cannot support the grant of a
Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim upon
which relief can be granted.'"   Id. (quoting Green v. Maraio, 722
F.2d 1013, 1018 (2d Cir. 1983)).   Thus, as the Supreme Court has
stated, "[t]he fate of an official with qualified immunity
depends upon the circumstances and motivations of his actions, as
established by the evidence at trial."   Imbler, 424 U.S. at 419,
n.13 (citations omitted).

### a. Qualified Immunity Defense of City Defendants

"Qualified immunity 'shields police officers acting in their
official capacity from suits for damages under 42 U.S.C. § 1983,
unless their actions violate clearly-established rights of which
an objectively reasonable official would have known.'"   Holeman
v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005) (quoting
Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999)).   Thus, if an

51

officer acts even in the absence of probable cause, she will be entitled to qualified immunity from a suit for malicious prosecution, or false arrest, if she can show that there was at least "arguable probable cause." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Id. (internal citation and quotations omitted). "In order for Defendants to be protected by qualified immunity on Plaintiff's claim for malicious prosecution, however, they must establish that they had 'arguable' probable cause for each charge." Cooperstein v. Procida, No. 00 CV 2642, 2001 WL 715831, at *4 (E.D.N.Y. June 4, 2001); see also, Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991) (holding that probable cause as to one charge does not preclude a malicious prosecution claim as to another charge).

City Defendants ask the Court to find that qualified immunity shields them from every claim raised by Plaintiffs' suit. Citing the Supreme Court's decision, Saucier v. Katz, 533 U.S. 194, 200 (2001) and the Second Circuit's ruling, Tierney v. Davidson, 133 F.3d 189, 194 (2d Cir. 1998), City Defendants argue

52

that qualified immunity questions must be "resolved at the earliest possible stage of litigation." However, neither of the authorities upon which City Defendants rely consider qualified immunity a basis for dismissal on a Rule 12(b)(6) motion. More precisely, Saucier, considering the denial of a motion for summary judgment, held that qualified immunity issues should be resolved "early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier, at 200. Likewise, Tierney reviewed a district court ruling on a summary judgment motion, after the completion of discovery. Tierney, 133 F.3d at 193-194.

At this stage of the instant action, Plaintiffs have made broad, general claims including that Defendants intentionally suppressed material, exculpatory evidence, that Defendants fabricated evidence wholesale, and that Defendants engaged in impermissibly coercive interrogation tactics, including physical abuse. If a jury were to believe Plaintiffs' accounts of what transpired in the course of their arrests and prosecution, then officers would not be able to establish that they had arguable probable cause to arrest and prosecute Plaintiffs' for the rape and assault of Patricia Meili.

Further factual determinations are clearly prerequisite to determining whether the City Defendants are entitled to a qualified immunity bar from Plaintiffs' suit.  Accordingly, City Defendants' motion to dismiss on the grounds that they are shielded by qualified immunity is DENIED.

However, Plaintiffs must put City Defendants on notice of what misconduct they are being sued for; to do so, Plaintiffs must specify which allegations are made against which Defendant. "To state a claim for damages under § 1983 a plaintiff must allege specific facts to demonstrate that defendants were personally or directly involved in the violation, that is, that there was 'personal participation[22] by one who had knowledge of the facts that rendered the conduct illegal." Houston v. County of Westchester Dep't of Corr., No. 06 Civ. 3395, 2006 WL 3498560, at *4 (S.D.N.Y. Dec. 5, 2006) (citing Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001).

---

[22] In Provost, the Second Circuit notes that personal involvement can be established to the satisfaction of a jury by demonstrating that a supervisory defendant, 1) personally participated in the alleged constitutional violation, 2) was grossly negligent in supervising subordinates who committed the wrongful acts, or 3) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. 262 F.3d at 154.

### b. Qualified Immunity Defense of DA Defendants

While a prosecutor's conduct as an advocate, either in initiating a prosecution or presenting a case on behalf of the Government, is protected by absolute prosecutorial immunity for such conduct, actions outside these traditional functions are not.  Administrative work, investigations, and other activities independent of prosecutorial conduct are entitled instead to a qualified "good faith" immunity rather than absolute immunity. See Taylor v. Kavanaugh, 640 F.2d 450, 452-53 (2d Cir. 1981). The Second Circuit has identified the tasks of testifying before a grand jury, accumulating evidence, and disseminating information to the press as equivalent to police work and grants qualified immunity to prosecutors performing these functions. Kavanaugh, 640 F.2d at 453.

The premise of the qualified immunity doctrine contemplates a focus on the particular facts of a case.  Should the Plaintiffs make out specific allegations of non-prosecutorial activities for each DA Defendant, there would remain for the jury the question of whether DA Defendants violated Plaintiffs' clearly established rights, of those which a reasonable person would have been aware.[23]

---

[23] Plaintiffs must put DA Defendants on notice of what conduct they are being sued for; to do so Plaintiffs must specify which

Accordingly, the Court likewise DENIES DA Defendants' Motion

to Dismiss Plaintiffs' Complaints on this ground.

### 5. The Sufficiency of Plaintiffs' Claims

The pleading standard set forth in Rule 8(a)(2) of the

Federal Rules of Civil Procedure had been settled since Conley v.

Gibson, 355 U.S. 41, 45-47 (1957):

> In appraising the sufficiency of a complaint
> we follow, of course, the accepted rule that
> a complaint should not be dismissed for
> failure to state a claim unless it appears
> beyond doubt that the plaintiff can prove *no*
> *set of facts in support of his claim that*
> *would entitle him to relief.*
> . . .
> The respondents also argue that the complaint
> failed to set forth specific facts to support
> its general allegations of discrimination and
> that its dismissal is therefore proper. The
> decisive answer to this is that the Federal
> Rules of Civil Procedure do not require a
> claimant to set out in detail facts upon
> which he bases his claim. To the contrary,
> all the Rules require is a *'short and plain*
> *statement of the claim' that will give the*
> *defendant fair notice of what the plaintiff's*
> *claim is and the grounds upon which it rests.*

In Bell Atlantic v. Twombly, 127 S.Ct 1955, 1964-65 (2007),

in reversing the Circuit Court's reinstatement of the complaint

dismissed with prejudice by the district court, the Supreme Court

allegations are made against which Defendant. Plaintiffs'
pleadings must indicate which facts are alleged against DA
Morgenthau, ADA Lederer and ADA Clements, in addition to those
allegations made regarding ADA Fairstein. See Houston, 2006 WL
3498560 at *4.

56

emphasized that the entitlement to relief must be supported by some factual allegations:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations [citation omitted], a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, [citation omitted]. Factual allegations must be enough to raise a right to relief above the speculative level.
> ...
> While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant 'set out in detail the facts upon which he bases his claim', [citation omitted] [emphasis in original] Rule 8(a)(2) still requires a 'showing', rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.

Justice Stevens, in his dissent, was in agreement on this point:

> The majority is correct to say that what the Federal Rules require is a 'showing' of entitlement to relief... Whether and to what extent that 'showing' requires allegations of fact will depend on the particulars of the claim. For example, had the amended complaint in this case alleged only parallel conduct, it would not have made the required 'showing'. Similarly, had the pleadings

> contained *only* an allegation of agreement,
> they would have been susceptible to the
> charge that they did not provide sufficient
> notice that the defendants may answer
> intelligently. Omissions of that sort
> instance the type of 'bareness' with which
> the Federal Rules are concerned.

Id. at 1980, n.6.

Specifically, the Supreme Court found the Bell Atlantic

complaint insufficient in its pleadings:

> The need at the pleading stage for
> allegations plausibly suggesting (not merely
> consistent with) agreement reflects the
> threshold requirement of Rule 8(a)(2) that
> the 'plain statement' possess enough heft to
> 'sho[w] that the pleader is entitled to
> relief'... *An allegation of parallel conduct*
> *is thus much like the naked assertion of*
> *conspiracy in a § 1 complaint: it gets the*
> *complaint close to stating a claim, but*
> *without some further factual enhancement it*
> *stops short of the line between possibility*
> *and plausibility of 'entitle[ment] to*
> *relief.'* Cf DM Research, Inc. v. College of
> Am Pathologists, 170 F.3d 53, 56 (1st Cir.
> 1999)('[T]erms like 'conspiracy' or even
> 'agreement' are borderline: they might be
> sufficient in conjunction with a more
> specific allegation - for example,
> identifying a written agreement or even a
> basis for inferring a tacit agreement, but a
> court is not required to accept such terms as
> a sufficient basis for a complaint.')"

Id. at 1966 (emphasis added).

The Second Circuit in Iqbal v. Hasty, 490 F.3d 143, 157-58

(2d Cir. 2007) deciphered Bell Atlantic and concluded:

> After careful consideration of the Court's
> opinion and the conflicting signals from it
> that we have identified, we believe the Court
> is not requiring a universal standard of
> heightened fact pleading, but is instead
> requiring a flexible 'plausibility standard',
> which obliges a pleader to amplify a claim
> with some factual allegations in those
> contexts where such amplification is needed
> to render the claim plausible.

The Circuit also noted that it would be "cavalier" to believe that the ruling applied only to § 1 antitrust claims. Id. at n.7.

With this recent guidance in mind, the Court now turns to that portion of Defendants' motion that challenges the sufficiency of Plaintiffs' claims.

### a. § 1983 Malicious Prosecution Claims

Apart from DA Defendants' absolute immunity challenge to Plaintiffs' malicious prosecution claim, and City Defendants' absolute[24] and qualified immunity challenge to Plaintiffs' malicious prosecution claim, both DA and City Defendants raise the substantive challenge that Plaintiffs cannot show favorable termination of the criminal proceedings against them.  This challenge is untenable.

"A plaintiff alleging the constitutional tort of malicious prosecution in an action pursuant to § 1983 must establish

---

[24] City Defendants are representing former ADA Linda Fairstein.

59

termination of the prosecution in his favor *in accordance with applicable state law.*"[25]  Hygh v. Jacobs, 961 F.2d 359, 367-68 (2d Cir. 1992) (emphasis added); see also, Pinaud v. County of Suffolk, 52 F.3d 1139 (2d Cir. 1995) (relying on Hygh to analyze the favorable termination element of a § 1983 malicious prosecution claim).[26]  Although Defendants repeatedly declare that Plaintiffs have not been exonerated or proven innocent, "New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence."  Rothstein v. Carriere, 373 F.3d 275, 286 (2d Cir. 2004).  Rather, the law in New York could not be clearer:  "[A]ny termination of a criminal prosecution, such that the criminal charges may not be brought again, qualifies as a favorable termination, so long as the circumstances surrounding the termination are not inconsistent

---

[25] To make out a § 1983 malicious prosecution claim, a plaintiff must allege facts demonstrating: (1) the initiation or continuation of a criminal proceeding against him or her; (2) that the proceeding terminated in his or her favor; (3) that there was a lack of probable cause for commencing the proceeding; and, (4) that actual malice is the motivation for defendant's conduct.  Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003).

[26] "Under Albright, the Fourteenth Amendment right to substantive due process will not support a federal claim for malicious prosecution." Singer v. Fulton County, 63 F.3d 110, 114 (2d Cir. 1995) (analyzing a § 1983 malicious prosecution claim in light of Albright v. Oliver, 510 U.S. 266 (1994)).

with the innocence of the accused."  <u>Cantolino v. Danner</u>, 96
N.Y.2d 391, 395 (2001).

    In 2002, the District Attorney's Office submitted to the
post-conviction court a 58 page Affidavit, the "Affirmation in
Response to Motion to Vacate Judgment of Conviction."  The
Affirmation detailed the reasons why the District Attorney's
Office found credible Matias Reyes' confession, corroborated by
newly discovered DNA evidence, that he alone raped and attacked
Patricia Meili.  (DA Defs.' Mot. to Dis. Exh. E.)  The
Affirmation identified specific facts and circumstances that are
incompatible with the guilt of Plaintiffs; it highlighted
inconsistencies in their confessions and challenged the probative
value of the forensic evidence connecting Plaintiffs to the
attack.  (DA Defs.' Mot. to Dis.  Exh. E ¶ 101-102.)  The
District Attorney's Office joined Plaintiffs in requesting
vacatur and a new trial and informed the post-conviction court
that the State would voluntarily dismiss all charges against
Plaintiffs if that motion were granted.  (DA Defs.' Mot. to Dis.
Exh. E at 56-57.)

    Under these circumstances, it would appear that the
termination of criminal proceedings against Plaintiffs was "not
inconsistent" with innocence.  <u>See</u> <u>Janovic v. City of New York</u>,

61

No. 04 Civ. 8437, 2006 WL 2411541, at *10 (S.D.N.Y. Aug. 17, 2006) ("After reversal and remand, [Defendant] was cloaked again in the constitutional presumption of innocence.  The subsequent dismissal with prejudice in the interests of justice is fully 'consistent with innocence.'").

DA and City Defendants also raise the substantive challenge that Plaintiffs' malicious prosecution claim is defeated by a presumption of probable cause, which Plaintiffs cannot overcome. (DA Defs.' Mem. Law at 24; City Defs.' Mem. Law at 54.)  In a § 1983 malicious prosecution claim, the presumption of probable cause is likewise analyzed in accordance with state law.  Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003) ("[T]he analysis of the state and the federal claims is identical.")  "Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause."  Lowth v. Town of Cheektowaga, 82 F.3d 563, 572 (2d Cir. 1996).

Moreover, in New York, a conviction ultimately upset is accorded only the force of prima facie evidence of probable cause; this evidence can be surmounted in a suit for malicious prosecution if the plaintiff can show that the judgment was

62

obtained by fraudulent or otherwise undue means.   <u>Williams v.</u>
<u>City of New York</u>, 508 F.2d 356, 359-60 (1974).

Plaintiffs allege that Defendants suppressed exculpatory
evidence, fabricated statements, failed to investigate adequately
evidence of innocence,[27] and that convictions against them were
procured by fraudulent and coercive conduct.  Of course, to the
extent that any of these allegations refer to prosecutorial
activities, DA Defendants are immune.  These claims, however,
baldly stated are not sufficient to put each Defendant on notice
of what they allegedly did or did not do.

Finally, Defendants argue that Plaintiffs' malicious
prosecution claim must be dismissed because Plaintiffs cannot
demonstrate the requisite malice.  (City Defs.' Mem. Law at 53.)

---

[27] <u>See</u> <u>Coleman v. City of New York</u>, 49 Fed. Appx. 342, 345 (2d Cir.
2002) (citing the dissent in <u>U.S. v. Rosario</u>, 543 F.2d 6, 10 (2d Cir.
1976)):

> Coleman alleges that the defendants could have
> done more to confirm the clerk's identity during
> the seven months between September 19, 1997 and
> Coleman's arrest on April 14, 1998.  This may be.
> However, the standard for probable cause is not
> as demanding as the standard for criminal
> conviction. *See Rosario*, 543 F.2d at 10 (Meskill,
> J., *dissenting*) ("Sufficient probability, not
> certainty, is the touchstone of
> reasonableness.").  It was sufficiently probable
> that Coleman was the clerk seen on September 19,
> 1997, and therefore, the defendants had no
> obligation to actively eliminate other possible
> suspects.  Thus, Defendants had probable cause to
> seize Coleman on February 5, 1998 and arrest
> Coleman on April 14, 1998 for receiving an
> unlawful gratuity on September 19, 1997.

In New York, "malice does not have to be actual spite or hatred, but means only that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served."  Lowth, 82 F.3d at 573.  Thus Plaintiffs have made out that their entitlement to relief is plausible, but they have failed to give sufficient notice to the Defendants.

Accordingly, Plaintiffs' malicious prosecution claims are hereby DISMISSED without prejudice.  Plaintiffs are given leave to amend their malicious prosecution claims as to each City Defendant and as to non-prosecutorial claims against DA Defendants.

### b. §§ 1983 and 1985 Conspiracy Claims

Defendants argue that Plaintiffs fail to state a claim for conspiracy under either § 1983 or § 1985.  (City Defs.' Mem. Law at 61; DA Defs.' Mem. Law at 39.)

The elements of a § 1983 conspiracy claim for deprivation of civil rights include, (1) an agreement between two or more state actors, or a state actor and a private entity, (2) to act in concert to inflict constitutional injury, (3) an overt act done in furtherance of the goal of causing damages.  Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted).

**64**

To recover under a § 1985 conspiracy claim for deprivation of civil rights, a plaintiff must prove: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws...; (3) an act in furtherance of the conspiracy; (4) whereby a person is... deprived of any right of a citizen of the United States." Bacon v. Suffolk Legislature, No. 05-CV-4307, 2007 WL 2288044, at *10 (E.D.N.Y. Aug. 8, 2007) (citing Brown v. City of Oneonta, 221 F.3d 329, 341 (2d Cir. 2000)).

In this case, the Court finds that Plaintiffs have alleged facts which render a civil rights conspiracy claim plausible. Plaintiffs allege that Defendant police officers and prosecutors acted in concert to coerce and fabricate statements and conceal exculpatory evidence. They allege that the fabrication of Plaintiffs' statements was an overt act in furtherance of this conspiracy, as were the subsequent acts of concealing the fabrication and withholding evidence regarding Matias Reyes. Unlike in Bell Atlantic, "'we do not encounter here a bare allegation of conspiracy supported only by an allegation of conduct that is readily explained as individual action plausibly taken in the actors' own economic interests.'" Iqbal v. Hasty 490 F.3d 143, 177 (2d Cir. 2007)

Accordingly, Defendants' Motion to Dismiss Plaintiffs' §§ 1983 and 1985 conspiracy claims is DENIED.

c. § 1981 Claims

City Defendants charge that Plaintiffs fail to meet the pleading standards of a § 1981 claim.

In pertinent part, 42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The essential elements of a § 1981 claim are that misconduct relating to one or more of the activities enumerated by the statute is racially motivated and purposefully discriminatory. General Building Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375 (1982); Mian v. Donaldson, 7 F.3d 1085 (2d Cir. 1993). To establish a § 1981 claim a Plaintiff must show these elements, and must be a member of a racial minority.  Lauture v. International Business Machines Corp., 216 F.3d 258, 261 (2d Cir. 2000).

In <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506 (2002), the
Court found that where the plaintiff's complaint alleged dates
and events relevant to her § 1981 claims, and alleged that the
termination of her contract was racially motivated, her
employment discrimination claims were sufficiently pleaded to
survive a motion to dismiss.

Although that case involved specifically an employment
discrimination claim, this Circuit has adopted the Swierkiewicz
rationale for other § 1981 claims.  See <u>Phillip v. University of
Rochester</u>, 316 F.3d 291, 298 (2d Cir. 2003) (considering a claim
for violation of the equal benefit provision of § 1981 and
applying the <u>Swierkiewicz</u> reasoning); <u>see also</u>, <u>Patane v. Clark</u>,
No. 06-3446-CV, 2007 WL 4179838, at *3 (2d Cir. Nov. 28, 2007)
(dismissing the Plaintiff's Title VII Complaint after noting that
it failed to, for example, allege that any defendant made any
remarks which could be viewed as reflecting discriminatory
animus, or allege that any other male employees were given
preferential treatment when compared to the Plaintiff).

In this case, Plaintiffs make no allegations which can be
interpreted to show racial discrimination or plausible
entitlement to relief.  Plaintiffs conclusorily assert that
Defendants acted with racial animus in a purposefully

discriminatory manner.  Nowhere do Plaintiffs explicitly allege
any facts which show that any Defendant was motivated by racial
animus, or which show that Defendants deliberately acted
discriminatorily.

Consequently, Plaintiffs § 1981 claim cannot stand as
pleaded, and the Court hereby DISMISSES this claim without
prejudice.

### d. § 1983 Monell Claims

Plaintiffs' Complaints raise two claims of municipal
liability under Monell v. Dept. Social Services, 436 U.S. 658,
694 (1978).  One count is raised against the City of New York and
the other count is raised against the New York County District
Attorney's Office. (McCray Compl. ¶¶ 91-99; Salaam Compl. ¶¶ 110-
117; Wise Compl. ¶¶ 92-101.)  Plaintiffs seek to hold Defendants
accountable for § 1983 constitutional violations under three
theories of Monell liability.  (Pls.' Mem. Law at 59.)

First, Plaintiffs charge that City Defendants maintained a
custom, policy or practice of fabricating inculpatory statements,
particularly when dealing with minors.  (Id.)  Next, Plaintiffs
aver that City Defendants ratified the unlawful behavior of
government authorities by failing to investigate properly that
misconduct, making public findings absolving the misconduct and

by failing to adopt practices to prevent the misconduct from recurring. (Id.)  Finally, Plaintiffs complain that City Defendants and DA Defendants failed to discipline properly, train or supervise police officers and prosecutors with regard to interrogation procedures, fabrication of evidence, coercion, failure to investigate evidence of innocence, and disclosure of Brady material. (Id.)  Plaintiff Salaam additionally alleges that Defendants maintained a practice of publically vilifying persons accused of high-profile crimes.  (Salaam Compl. ¶ 115(e).)

Defendants move to dismiss these claims on the ground that Plaintiffs fail to allege adequately facts that amount to Monell claims, under any theory of liability.  (DA Defs.' Mem. Law at 60; City Defs.' Mem. Law at 66.)  DA Defendants in particular argue that because Plaintiffs' Monell claim against the "New York County District Attorney's Office" is raised against a non-sueable entity it should be dismissed.  (DA Defs.' Mem. Law at 52.)  DA Defendants further argue that any Monell claim raised against DA Morgenthau in his official capacity is unnecessarily duplicative, and that any claim raised against DA Morgenthau in his individual capacity, as a municipal policy-maker, is deficient. (DA Defs.' Mem. Law at 54-59.)

Under <u>Monell</u>, local governments and their agencies can be sued as "persons" under § 1983 and may be liable where a government policy or custom gives rise to a constitutional deprivation.  A "custom" does not require official sanction; instead, a custom "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  <u>Board of County Comm'rs v. Brown</u>, 520 U.S. 397, 404 (1997) (citations omitted).  To make a claim for municipal liability, it is not sufficient to allege merely conduct attributable to the municipality.  <u>Id.</u>  "A plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  <u>Id.</u>  Thus, the elements of a <u>Monell</u> claim include:  1) an official policy or custom that, 2) causes the plaintiff to be subjected to, 3) a deprivation of a constitutional right.  <u>Batista v. Rodriguez</u>, 702 F.2d 393, 397 (2d Cir. 1987).  A City may not be held liable for the actions of its employees or agents under a theory of <u>respondeat superior</u>.  <u>Id.</u> at 397.

### (1) **The New York County District Attorney's Office**

Plaintiffs argue that, for purposes of the failure to train **Monell** claims, this Circuit recognizes the District Attorney's Office as a sueable entity.  They cite no authority in support of this claim.[28]

In **Steed v. Delohery**, No. 96 Civ. 2449, 1998 WL 440861, at *1 (S.D.N.Y. Aug. 4, 1998), the District Court considered a § 1983 claim and held that "[t]he New York County District Attorney's Office is not a suable entity."  In **Gonzalez v. City of New York**, No. 98 Civ. 6081, 1999 WL 549016, at *1 (S.D.N.Y. July 28, 1999), the District Court also considered a § 1983 claim and found that the District Attorney's Office did not have a legal existence distinct from the district attorney.  Most recently, in **Michels v. Greenwood Lake Police Dep't**, 387 F.Supp.2d 361, 365 (S.D.N.Y. 2005), the District Court, after reviewing the history of this jurisprudence, found that the District Attorney's Office is not a suable entity.

---

[28] The only controlling authority Plaintiffs point the Court to, **Walker v. City of New York**, 974 F.2d 293, 300 (1992) does not hold that the District Attorney's Office is a sueable entity.  Indeed, the District Attorney's Office was not a named Defendant in that case.  As discussed, *infra* at note 26, **Walker** stands for the proposition that allegations of deliberate indifference by the District Attorney provide a proper basis for holding the City of New York liable. (**Id.**)

Accordingly, all claims against the District Attorney's Office are DISMISSED WITH PREJUDICE.[29]

### (2) Plaintiffs' Remaining *Monell* claims

Plaintiffs cite <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163 (1993) for the principle that the Court may not apply a heightened pleading standard in cases alleging municipal liability. (Pls.' Mem. Law at 59.) While the Court agrees that <u>Leatherman</u> is applicable here, the Court finds that Plaintiffs' Complaints do require amplification to render their § 1983 <u>Monell</u> claims plausible.[30]

---

[29] As DA Defendants point out in their moving papers, Plaintiffs could also amend their Complaints to include an "official capacity action" against DA Morgenthau. (DA Defs.' Mem. Law at 53.) However, the Court agrees with DA Defendants that such a charge would be unnecessarily duplicative of Plaintiffs' <u>Monell</u> action against the institutional entity of the City of New York. (<u>Id.</u> at 54.), <u>see also</u>, <u>Barmore v. Aidala</u>, No. 04-CV-0445, 2006 WL 1978449, at *10 (N.D.N.Y. July 10, 2006) (dismissing plaintiff's official capacity claims as redundant where a <u>Monell</u> claim was already raised against a governmental entity because "the real party in interest in an official capacity suit is the governmental entity and not the named official"). Accordingly, such an amendment would be futile. Plaintiffs could raise an individual capacity claim against DA Morgenthau as a municipal policy maker; such a claim would of course need to meet sufficiently requisite pleading standards. <u>See</u> <u>Walker v. City of New York</u>, 974 F.2d 293, 301 (2d Cir. 1992) (holding that allegations of deliberate indifference by the District Attorney can provide a proper basis for finding municipal liability).

[30] The Supreme Court's <u>Bell Atlantic</u> ruling makes clear that <u>Leatherman</u> remains undisturbed. 127 S.Ct. 1955, 1973 n.14 (2007) ("our concern is not that allegations in the complaint were insufficiently 'particularized', [citation omitted] rather, the complaint warranted dismissal because it failed *in toto* to render Plaintiffs' entitlement to relief plausible.")

72

See Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007).  While
Plaintiffs enumerate multiple offensive policies or customs, they
fail to allege facts that sufficiently render a claim based on
the inference of such practices plausible.[31]

        As a threshold matter, Plaintiffs fail to plead plausibly  a
pattern: that is, that any of the conduct they allege causes
people to be subject to constitutional right deprivations -
including a) the fabrication of inculpatory statements of minors,
b) the ratification of misconduct (the Armstrong Report), c) the
failure to train or supervise, and d) the public vilification of
persons accused of high-profile crimes - arise out of more than
an isolated incident.  Although Plaintiffs argue in their
Memorandum of Law that they need not present evidence of a
pattern of misconduct, they cite only Tenth Circuit, First
Circuit and Sixth Circuit authority for this proposition.
(Defs.' Mem. Law at 62, citing Allen v. Muskogee, 119 F.3d 837,
842 (10th Cir. 1997), Voutour v. Vitale, 761 F.2d 812, 821-822 (1st
Cir. 1985) and Russo v. City of Cincinnati, 953 F.2d 1036, 1047

---

[31] The Court notes moreover, that while the Plaintiffs allege Monell
claims against both the Police Department and the District Attorney's
Office, in at least two Complaints, the policies enumerated appear to
be identical.  For instance, the District Attorney's Office is alleged
to have maintained a policy of failing to train or supervise police
officers, and failing to discipline officers.  (Salaam Compl. ¶ 115;
Wise Compl. ¶ 97(e).)

(6ᵗʰ Cir. 1992).  In this Circuit, "proof of a single incident of unconstitutional activity is not sufficient to impose liability ... unless [the incident] was caused by an existing unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  Brome v. City of New York, No. 02 Civ. 7184, 2004 WL 502645, at *7 (S.D.N.Y. 2004) (citing City of Oklahoma v. Tuttle, 471 U.S. 808, 823-824 (1985)); see also, Carnesi v. City of New York, 98 Civ. 4899, 2001 WL 1098027, at *5 (S.D.N.Y. 2001) (granting a motion to dismiss because the allegation of single incident by an individual without policymaking authority is generally insufficient to infer a policy or custom on the part of a local government unit) (citing Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir.1992))

With respect to Plaintiffs' first theory of Monell liability, the misconduct of fabricating the statements of minors, although the causal link between practices regarding fabricating statements and Plaintiffs' alleged constitutional deprivations may be plausible, Plaintiffs must provide more than mere conclusory allegations; they must add specific factual support to show the existence of a pattern.[32]  Similarly, failure to train,

---

[32]  See also, Wilson v. 103RD Precinct, 182 F.3d 902 (2d Cir. 1999) (stating that even under the liberal pleading standards of Leatherman, simple bald assertions and conclusions of law do not prevent the dismissal of a complaint).

**74**

without more, is insufficient: "the simple recitation that there
was a failure to train municipal employees does not suffice to
allege that a municipal custom or policy caused the [P]laintiffs'
injur[ies]." Dwares v. City of New York, 985 F.2d 94, 100 (2d
Cir. 1993). The Court does not find sufficient factual support
in the Complaints to show that there may have been a
constitutional deprivation caused by Defendants' alleged
practices of ratifying misconduct, or public vilification.

Accordingly, Plaintiffs Monell claims are hereby DISMISSED
without prejudice. Plaintiffs are granted leave to replead their
§ 1983 Monell claims with factual allegations that are sufficient
to render these claims plausible.

e. Familial Association Claims

Defendants maintain that since Plaintiffs have no viable
claims for constitutional violations, then Plaintiffs' familial
association claims must be dismissed. (DA Defs.' Mem. Law at 49;
City Defs.' Mem. Law at 75.)

The Second Circuit has held that relatives maintain, "in
general terms, a substantive right under the Due Process Clause
to remain together without the coercive interference of the
awesome power of the state." Anthony v. City of New York, 339
F.3d 129, 142-43 (2d Cir. 2003). In order to prevail on a claim

for violation of the substantive due process right of familial
association, a plaintiff "must demonstrate that [the alleged
offending act] was so shocking, arbitrary, and egregious that the
Due Process Clause would not countenance it even were it
accompanied by full procedural protection." Id. at 143 (internal
citation and quotations omitted) (holding that a woman's
temporary separation from her sister due to involuntary
confinement at a hospital did not violate her sister's
substantive due process right to familial association).  To rise
to a "conscience-shocking level," the misconduct alleged in a
substantive due process claim must be either conduct intended to
injure in some way unjustified by any governmental interest, or
inflicted with deliberate indifference that was shocking under
the circumstances. Miner v. New York State Dep't of Health, No.
02 Civ. 3180, 2004 WL 1152491, at *5 (S.D.N.Y. May 24, 2004)
(finding the lack of deliberate indifference fatal to the
familial association claim of an inmate whose wife filed for
divorce after receiving an inaccurate letter notifying her that
her husband was HIV positive).

       However, Familial Plaintiffs make no showing that Defendants
acted with intent to disrupt familial association, or that
Defendants acted with deliberate indifference to their familial

association rights.   See <u>Busch v. City of New York</u>, No. 00 CV
5211, 2003 WL 22171896, at *4 (E.D.N.Y. Sept. 11, 2003) (Family
members of man shot and killed by police could not recover for
loss of rights to familial relationship where there was no
evidence of purposeful intent on the part of officers to
interfere with familial relationship).

Thus Plaintiffs' Complaints do not state a substantive due
process claim for loss of familial association.  Plaintiffs' loss
of familial association claims are hereby DISMISSED without
prejudice, and Plaintiffs are given leave to replead.

f. <u>Plaintiffs' Due Process Claims in Memorandum of Law,</u>
<u>not Complaints</u>

Plaintiffs argue in their Memorandum of Law opposing
Defendant's Motions to Dismiss that, "Defendants have not
addressed Plaintiffs' Due Process claims regarding fabrication of
evidence, failure to investigate and numerous Brady violations."
(Pls.' Mem. Law at 20).  DA Defendants respond that, except for a
passing mention in Plaintiff Salaam's Complaint, Plaintiffs'
pleadings fail to set forth an independent cause of action for
denial of the right to a fair trial under the Due Process clause.
(DA Defs.' Rep. Mem. Law at 12.)  These claims, prosecutorial in
nature, cannot stand against the DA Defendants.  However, if

properly pleaded, City Defendants may be liable for such conduct
under Due Process rights to a fair trial.

This claim is DISMISSED without prejudice.

### 6. Pendent Jurisdiction Claims

City Defendants have asked the Court to decline to exercise
pendent jurisdiction over any of Plaintiffs' remaining state
claims. (City Defs.' Mem. Law at 76-77).  DA Defendants have
raised procedural and substantive challenges to all of Plaintiffs
state law claims. (DA Defs.' Mem. Law at 70-79).

Plaintiffs among them appear to advance additional claims
for violations of the New York State Constitution, intentional
infliction of emotional distress, negligent infliction of
emotional distress, assault and battery, harassment, general
negligence and conspiracy. (McCray Compl. ¶¶ 101, 104; Wise
Compl. ¶¶ 96, 98; Salaam Compl. ¶¶ 92, 119, 122-25, 128, 132,
138, 140-41, 144, 147-48.)  In their Memorandum of Law in
Opposition to Defendants' Motions to Dismiss, Plaintiffs
stipulate that claims for assault and battery and harassment may
be dismissed.  (Pls.' Mem. Law at 75, n.75.)  The Court hereby
DISMISSES these claims WITH PREJUDICE.

All that remain for consideration are state law claims of
intentional infliction of emotional distress, negligent

infliction of emotional distress, general negligence and conspiracy.  The Court addresses each state law claim in turn.

### a. Intentional Infliction of Emotional Distress

Under New York law, it is established that a claim for intentional infliction of emotional distress must be raised within one year.  Cabrera v. Quik Park Columbia Garage Corp., No. 00-CV-3576, 2000 WL 1897348, at *1 (E.D.N.Y. Dec. 18, 2000).  A claim for intentional infliction of emotional distress accrues on the date of the "last actionable act" of the alleged course of conduct.  Nuefeld v. Nuefeld, 910 F.Supp. 977, 983 (S.D.N.Y. 1996).  "To prevail on a cause of action for intentional infliction of emotional distress, a plaintiff must prove four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard for the substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."  Marmelstein v. Kehillat New Hempstead, 841 N.Y.S.2d 493, 499 (2007).

Considering facts in the light most favorable to Plaintiffs, a claim based on the adoption of the Armstrong Report, would have accrued, at the latest, upon the release of the Armstrong Report on January 27, 2003 and might conceivably support an intentional

infliction of emotional distress claim against Police
Commissioner Kelly.  As to the other Defendants, the misconduct
constituting an intentional infliction of emotional distress
action is not clear.  Conduct predicated on the criminal
prosecution of Plaintiffs cannot survive the one year time bar as
such a claim would have accrued at the latest upon their release
from custody, in August 2002.  Accordingly, Plaintiffs must set
forth as to each remaining Defendant what acts were committed
within one year of the filing of the Complaints to stand.  The
claim against the other Defendants is hereby DISMISSED without
prejudice.

### b. Negligent Infliction of Emotional Distress

In New York, negligent infliction of emotional distress
claims are subject to a three-year statute of limitations.
Dawkins v. Williams, 413 F.Supp.2d 161, 177 (N.D.N.Y. 2006). This
cause of action does not accrue until "all of the elements,
including damages, can be truthfully alleged in the complaint."
Augeri v. Roman Catholic Diocese of Brooklyn, 639 N.Y.S.2d 640,
645 (1995) (internal citation and quotations omitted).  To
establish a claim for negligent infliction of emotional distress,
a Plaintiff must show, "a breach of a duty owed to plaintiff
which exposes him or her to an unreasonable risk of bodily injury

or death."  Perl v. Burkes, 836 N.Y.S.2d 502 (2007) (internal
citation and quotations omitted).  Thus, a claim for negligent
infliction of emotional distress cannot lie unless there are
"unique facts where a special duty is owed."  Kojak v. Jenkins,
1999 WL 244098, *9 (S.D.N.Y. 1999) (internal citation and
quotations omitted).  Where there is no "obligation unique to the
plaintiff" owed, no recovery is allowed.  See Kelly v. Chase
Manhattan Bank, 717 F.Supp. 227, 235 (S.D.N.Y. 1985) (a
terminated employee cannot maintain a negligent infliction of
emotional distress cause of action because the employer owed the
same duties to all employees.)

Assuming Plaintiffs' allegations to be true, Plaintiffs
cannot make out a claim for negligent infliction of emotional
distress.  Not only do Plaintiffs fail to specify what conduct
substantiates this claim, Plaintiffs cannot allege that any
duties were owed uniquely to Plaintiffs.  None of the Defendants
in this action can be alleged to owe Plaintiffs a duty which is
not owed likewise to all citizens.  This claim is hereby
DISMISSED WITH PREJUDICE.

### c. General Negligence Claims

Plaintiffs raise state law claims for negligence generally
in causing injuries to Plaintiffs and in the hiring, retaining,

81

supervising and training of Defendant Officers and Defendant Assistant District Attorneys.

New York applies a three year statute of limitations to negligence causes of action. <u>Cialino v. O'Neill</u>, 844 N.Y.S.2d 98 (2007). To establish a prima facie case of negligence, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom. <u>Solomon by Solomon v. City of New York</u>, 66 N.Y.2d 1026, 1027 (1985). In New York, "A plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence... but must proceed by way of the traditional remedies of false arrest and imprisonment." <u>Johnson v. Kings County District Attorney's Office</u>, 763 N.Y.S.2d 635, 640 (N.Y.A.D. 2003) (citations and internal quotations omitted). Likewise, as a matter of public policy, New York does not recognize negligence claims predicated on a criminal prosecution. <u>Mitchell v. County of Nassau</u>, No. CV-05-4957, 2007 WL 1580068, at *13 (E.D.N.Y. May 24, 2007); <u>see also</u>, <u>Jenkins v. City of New York</u>, No. 91 Civ. 3639, 1992 WL 147647, at *8 (S.D.N.Y. June 15, 1992) (dismissing claims described as negligent investigation, negligent training, negligent supervision, negligent disciplining, negligent

82

retention of employees, and negligent provision of incorrect information because these claims arose out of the same set of facts as claims for false arrest and malicious prosecution and such claims are in contravention of New York public policy).

In the instant case, Plaintiffs fail to allege facts to support their claim for negligence which are distinct from the facts they have alleged in support of their malicious prosecution and false arrest claims.  Accordingly, Plaintiffs claims for negligence are DISMISSED WITH PREJUDICE.

### d. Conspiracy Claims

Finally, Plaintiffs allege a state law claim for "conspiracy to cover-up."  However, New York law does not recognize a substantive tort of civil conspiracy; in New York, allegations of civil conspiracy only serve to establish joint liability.  Valdan Sportswear v. Montgomery Ward & Co., 591 F.Supp. 1188, 1191 (S.D.N.Y. 1984) ("Allegations of a civil conspiracy, therefore, are proper only for the purpose of establishing joint liability by co-participants in tortious conduct.").  Thus, "a bare conclusory allegation of conspiracy does not state a cause of action."  Grove Press, Inc. v. Angleton, 649 F.2d 121, 123 (2d Cir. 1981); see also, Pappas v. Passias, 707 N.Y.S.2d 178, 180

(2000).[33]  Accordingly, any cause of action Plaintiffs raise for tortious conspiracy is hereby DISMISSED WITH PREJUDICE.

D. <u>Leave to Amend</u>

Even when a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  On the other hand,  "[w]hile it is the usual practice upon granting a motion to dismiss to allow leave to replead," <u>Cohen v. Citibank</u>, No. 95 Civ. 4826, 1997 WL 883789, at *2 (S.D.N.Y. Feb. 28, 1997), a court may dismiss without leave to amend when amendment would be futile.  <u>Oneida Indian Nation of N.Y. v. City of Sherrill</u>, 337 F.3d 139, 168 (2d Cir. 2003) (citing <u>Forman v. Davis</u>, 371 U.S. 178, 182 (1962)).  This Circuit recognizes a policy to construe liberally civil rights complaints and afford opportunity to amend such claims.  <u>Mian v. Donaldson</u>, <u>Lufkin & Jenrette Securities Corp.</u>, 7 F.3d 1085, 1087 (2d Cir. 1993) (citing <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163 (1993)).

However, Plaintiffs have failed to plead many of these claims with sufficient specificity to put each Defendant on notice of what he or she allegedly did or did not do, as required

---

[33] To the extent that, by including the term "cover-up" in their conspiracy claim, Plaintiffs were attempting to state a claim for conspiracy to commit fraud, the Court notes that New York also does not recognize an independent cause of action for conspiracy to commit fraud.  <u>Murphy v. Sheldon</u> 831 N.Y.S.2d 348 (2006).

84

by Federal Rules of Civil Procedure 8(a).[34]  Those claims have
been dismissed without prejudice.

Plaintiffs are granted leave to amend their Complaints so
that they may adequately set forth the bases for those claims as
to each Defendant.

E. Consolidation of the Complaints

Plaintiffs' actions, including McCray, et al. v. City of New
York, 03 Civ. 9685 (DAB), Wise, et al. v. City of New York, 03
Civ. 9974 (DAB), and Salaam, et al. v. City of New York, 03 Civ.
10080, are hereby consolidated for all purposes.  The caption of
these consolidated actions shall be "In re McCray, Richardson,
Santana, Wise and Salaam Litigation" and the files of these
consolidated actions shall be maintained under file No. 03 Civ.
9685.

Plaintiffs are hereby granted 60 days to amend their
Complaint.  Defendants are to move or Answer within 45 days of
being served with the Amended Consolidated Complaint.

---

[34] The Court recognizes that Plaintiffs have made some of their
allegations more appropriately specific within their Memorandum of
Law.  However, by doing so, Plaintiffs impermissibly attempt to amend
their Complaints in opposition to Defendants' Motions to Dismiss.  See
Fonte v. Bd of Managers of Continental Towers Condominium, 848 F.2d
24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs
or memoranda are also treated as matters outside the pleading for
purposes of Rule 12(b).")

85

### F. Remaining Defendants

Plaintiffs have failed to serve Richard and Rachel Roes, as well as John and Mary Does, within the time frame set by Federal Rule of Civil Procedure 4(m), or within the August 20, 2004 deadline this Court established in the June 18, 2004 Scheduling Order.  Additionally, the Court observes that neither Defendant Detective Colangelo nor Defendant Robert Fiston appear to be represented by counsel for the City Defendants, or by counsel for the DA Defendants.  Given Plaintiff Salaam's September 22, 2004 letter to the Court confirming the names of Defendants who were served, it appears to the Court that neither has been served. The Court hereby dismisses any claims against Richard and Rachel Roes, John and Mary Does or any other unserved Defendants, named or unnamed.  Finally, an action cannot be commenced against someone who is deceased.  Adelsberger v. United States, 58 Fed.Cl. 616, 618 (2003).  Accordingly, the Court DISMISSES claims brought against Defendant Benjamin Ward WITH PREJUDICE.


### III. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED in part and DENIED in part.  Plaintiffs are given leave to replead those claims not dismissed with prejudice.

Plaintiffs' claims DISMISSED WITH PREJUDICE include:

- official capacity claims barred by the Eleventh Amendment
- federal claims for false arrest,
- state law claims for false arrest,
- claims against DA Defendants for prosecutorial conduct,
- state law claims for battery,
- state law claims for assault,
- state law claims for harassment,
- state law claims for negligent infliction of emotional distress,
- state law claims for negligence,
- state law claims for conspiracy,
- claims against "the New York County District Attorney's Office"
- claims against Defendant Benjamin Ward;

Plaintiffs are given leave to replead:

- malicious prosecution claims,
- claims against DA Defendants for non-prosecutorial conduct,
- federal claims for racial discrimination,
- Monell causes of action not alleged against "the New York County District Attorney's Office",
- state law claims for loss of familial association,
- Due Process claims alleged in Memorandum of Law but not in Complaints,
- state law claims for intentional infliction of emotional distress causes of action alleged against Defendants other than Defendant Kelly.

SO ORDERED.
Dated:    New York, New York
          December 11 , 2007

_____
DEBORAH A. BATTS
United States District Judge

87